**Kenneth G. STEWART, Caron C. Stewart, Appellants–Plaintiffs,**

v.

**Leigh A. JACKSON, Rodney S. Jackson, Appellees–Defendants.**

No. 82A01–9310–CV–336.

Court of Appeals of Indiana, First District.

June 7, 1994.

Transfer Denied Nov. 4, 1994.

---

Allan G. Loosemore, Jr., Evansville, for appellants.

Jeffrey A. Wilhite, David L. Clark, Kahn, Dees, Donovan & Kahn, Evansville, for appellees.

BAKER, Judge.

Today we decide whether day care in a residence violates restrictive covenants barring nonresidential uses of property and specifically excluding commercial activity uses. We are mindful of the impact of our decision on today's society because many Indiana neighborhoods have similar restrictive covenants and day care homes.

Appellant-plaintiffs Kenneth and Caron Stewart appeal the denial of their petition for an injunction to prohibit appellee-defendants Rodney and Leigh Jackson from maintaining a day care in their home. We heard oral argument on this case on April 12, 1994, at St. Mary's-of-the-Woods College.

### FACTS

The Stewarts and the Jacksons are next-door neighbors in an Evansville, Indiana, subdivision. Leigh Jackson operates a home day care for remuneration and maintains a state license to care for ten children in her home. At times, she has cared for ten children with the assistance of a friend. The Stewarts, on the other hand, have operated two businesses from their home in the past: a general contracting construction company and a wholesale toy business. The restrictive covenants governing the neighborhood require lots be used solely for residential purposes and specifically exclude any commercial business, trade, or activity.

In January 1992, Leigh applied to the Evansville Board of Zoning Appeals for a special use permit to care for 6–10 children in her home as required by a local ordinance. In accordance with the local ordinance, Leigh sent notices to her neighbors to inform them of her application. At the board hearing, Kenneth opposed the permit citing traffic problems.

On January 24, 1992, the Stewarts filed suit against the Jacksons seeking injunctive relief to prohibit the Jacksons from operating the day care in their home, contending it violated the subdivision's restrictive covenants forbidding nonresidential use of subdivision lots and expressly proscribing commercial business, activity, or trade on the lots. Thereafter, Leigh abandoned her attempt to care for more than five children by withdrawing her request for a special use permit and by reducing her home day care to five children.

At the bench trial, the Jacksons presented evidence that in addition to four other day care homes in the neighborhood, a salesman worked out of his home, a woman taught piano lessons, another woman sold crafts from her home, and another man ran a part-time computer consulting business in his home. In addition, the Stewarts had incorporated a toy business, "The Idea People," and had operated as a toy manufacturer and wholesaler from their home. More recently, Kenneth Stewart had operated a contracting construction company, called First City Builders, from his home. Kenneth parked his commercial vehicle with a sign advertising his business on it in his driveway in violation of other restrictive covenants. In conjunction with their construction business, several deliveries were made to the Stewarts' home. Independent contractors regularly parked their construction vehicles in the street and in the Stewarts' driveway.

Neighbors, other than the Stewarts, claimed that the Jacksons' day care was an asset to the neighborhood and that it enhanced their relationships. Describing the neighborhood, one neighbor observed twenty-one kids, ranging from one-year to six-teen-years old, playing along one street on a nice day.

The trial court found that the Stewarts had substantially violated the restrictive covenants by operating their two businesses in their home and that they had acquiesced in similar day care homes in the neighborhood. The trial court also determined that the Jacksons had not violated the restrictive covenants, finding that home day care is not a commercial business, trade, or activity. The trial court further held that restrictive cove-

nants prohibiting home day care are void as against public policy.

## DISCUSSION AND DECISION

### I. Standard of Review

The Stewarts sought a permanent injunction, which is an extraordinary equitable remedy that should be granted only with caution. *See Day v. Ryan* (1990), Ind.App., 560 N.E.2d 77, 83. Injunctions are appropriate in cases where a restrictive covenant has been violated. *Austin v. Durbin* (1974), 160 Ind.App. 180, 310 N.E.2d 893. The denial of an injunction lies within the sound discretion of the trial court and will not be overturned unless it was arbitrary or amounted to an abuse of discretion. *Sauer v. Bartholomew County Bd. of Zoning Appeals*, No. 3A01–9305–CV–171, slip. op. at 5 (Ind.App. Feb. 28, 1994).

The trial court entered specific findings of fact and conclusions of law at the Stewarts' request. In reviewing the judgment, we must first determine whether the evidence supports the findings, and second, whether the findings support the judgment. *Vanderburgh County Bd. of Comm'rs v. Rittenhouse* (1991), Ind.App., 575 N.E.2d 663, 666, *trans. denied*. The judgment will be reversed only if it is clearly erroneous. *Id.* The Stewarts do not attack the findings of fact but claim the findings do not support the conclusions.

### II. Unclean Hands

We first entertain the Jacksons' contention that the Stewarts' arguments regarding residential and commercial use should not be considered because the trial court also denied the Stewarts' injunctive claim based upon "unclean hands." The Jacksons declared that the Stewarts themselves violated the restrictive covenants by operating two businesses from their home.

Caron Stewart attacks the findings and conclusions as clearly erroneous because she was not involved in either business that Kenneth ran from their home. Her argument is meritless because she violated the covenants by permitting her husband's commercial use of their property.

The Stewarts jointly raise two procedural arguments. They claim that the affirmative defense of unclean hands was not properly pled or presented to the trial court, so it is waived on appeal. *See* Ind. Trial Rule 8(C) (affirmative defenses must be raised in the pleadings); *Molargik v. West Enterprises, Inc.* (1993), Ind.App., 605 N.E.2d 1197, 1199 (failure to plead affirmative defenses results in waiver). However, if a defense is not raised in the pleadings, but was tried by the express or implied consent of the parties, then Ind. Trial Rule 15(B) treats it as if it had been properly raised. *Molargik*, at 1200. Thus, we reject the Stewarts' contention by noting that the Jacksons clearly asserted the affirmative defense of unclean hands at trial without objection from the Stewarts; therefore, the issue was tried by the consent of the parties. *See* Record at 68, 99.

The Stewarts also argue that the trial court did not base its judgment upon this defense. They are mistaken. The trial court clearly found that the Stewarts operated two businesses from their home; operated a general contracting construction company out of their home; continued to run that business for at least seven months after filing this action; and, parked vehicles on the street. The court further found that the Stewarts "have substantially violated the restrictive covenants." Record at 318–19. The trial court designated all findings of fact to be deemed conclusions of law. Record at 320. Unarguably, the above-noted findings and conclusions show that one of the theories upon which the trial court denied the Stewarts' claim was unclean hands.

Alternatively, the Stewarts argue that if the trial court based its decision on the theory of unclean hands that it was erroneous. They claim that they purged themselves by discontinuing their home businesses. The unclean hands doctrine is an equitable tenet which demands one who seeks equitable relief to be free of wrongdoing in the matter before the court. *W & W Equipment Co. v. Mink* (1991), Ind.App., 568 N.E.2d 564, 576, *trans. denied*. Indiana has recognized the ability to purge oneself of wrongdoing, which effectively restores the right to equita-

ble relief. *See Keller v. Indiana Dept. of State Revenue* (1988), Ind.Tax, 530 N.E.2d 787, 790, *appeal dismissed,* Ind., 549 N.E.2d 372. Because the Stewarts no longer operate any businesses from their home, they have purged themselves of unclean hands.[1] The Stewarts' claim is not defeated on the basis of unclean hands; hence, we reverse the trial court's determination regarding unclean hands.

### III.   Residential/Commercial Use

■ The Stewarts contend that the trial court erred as a matter of law in concluding that home day care is a residential use and not a commercial business, trade, or activity of a commercial nature. They essentially assert that home day care is a service for profit, and therefore, constitutes a commercial business, trade, or activity.

A "child care home" is defined statutorily in Indiana as:

a residential structure in which at least six (6) children (not including the children for whom the provider is a parent, stepparent, guardian, custodian, or other relative) at any time receive child care from a provider:

1) while unattended by a parent, legal guardian, or custodian;

2) for regular compensation; and

3) for more than four (4) hours but less than twenty-four (24) hours in each of ten (10) consecutive days per year, excluding intervening Saturdays, Sundays, and holidays.

IND. CODE 12–7–2–28.6 (1994). A person may not operate a child care home without a license in Indiana. IND. CODE 12–17.2–5–1. Indiana further limits the maximum number of children to 16 in a home day care. IND. CODE 12–7–2–33.8 (1994). By definition, a license is not required for the care of five or less children in one's home. As opposed to a child care home, a "child care center" usually refers to a nonresidential building where at least seventeen (17) children receive child care. IND. CODE 12–7–2–28.4(a) (1994). The Stewarts do not contend that the Jacksons maintained a child care center. Rather, the Stewarts seek to prevent the Jacksons from operating any size of day care, whether or not a license is required. At the time of the trial and judgment, Leigh cared for fewer than six children in her home; thus, she was not statutorily required to be licensed. Therefore, we limit our decision to the consideration of unlicensed home day care.[2]

The Stewarts' allegation that home day care violates their restrictive covenants is an issue of first impression in Indiana. We have wrestled with a similar issue: whether the operation of group homes in subdivisions violate restrictive covenants. In *Clem v. Christole* (1990), Ind.App., 548 N.E.2d 1180 (*Clem  I* ), we divided on whether group homes are prohibited by restrictive covenants which exclude commercial business from neighborhoods. On transfer, the majority of our supreme court did not address the issue splitting the appellate court, but rather, it decided that IND. CODE 16–13–21–14(a), prohibiting the enforcement of restrictive covenants that prevented the operation of group homes, violated the contract clause in article 1, § 24 of the Indiana Constitution. *Clem v. Christole* (1991), Ind., 582 N.E.2d 780 (*Clem II* ). The supreme court affirmed the trial court's initial decision that the group home violated the "single-family" restriction in the covenants, a different issue than presented here. *See Clem II,* at 785 (citing *Adult Group Properties, Ltd. v. Imler* (1987), Ind.App., 505 N.E.2d 459, *trans. denied* ). Notwithstanding the majority's refusal to address the issue, the dissenting minority of the supreme court held that restrictive covenants banning business and commercial activities in a subdivision did not prohibit group homes. *Clem II,* at 786. The dissent determined that group homes are

---

1. Although there is evidence that the Stewarts violated other restrictive covenants limiting the height of fences and the parking of commercial vehicles, these violations do not establish unclean hands because they are only incidental to the issues here. *See Keller,* at 788 (wrong invoking unclean hands doctrine must have an immediate and necessary relation to the matter before the court).

2. We do not address the broader issue of whether licensed home day care is a residential use.

residential uses. *Id.* In its analysis the dissent declared that the restrictive covenants were never intended to be read so broadly as to exclude home day care or group homes. *Id.*

Similarly, in *Minder v. Martin Luther Home Foundation* (1991), Ind., 582 N.E.2d 788, (*Minder II* ) our supreme court reversed our decision that because group homes are residential uses, not business uses, the restrictive covenants prohibiting business uses had not been violated. *Id.* at 789 (citing *Minder v. Martin Luther Home Foundation,* (1990), Ind.App., 558 N.E.2d 833) (*Minder I* ). Again, our supreme court did not address the residential use issue but decided on the same constitutional issue as in *Clem II.* It is interesting, though, that the supreme court remanded for the trial court to decide whether the group home violated the restrictive covenants. *Minder II,* at 789. Before proceeding, we note that unlike *Clem II,* no constitutional arguments are raised here. The Stewarts do not challenge the trial court's ruling as violative of the contract clause. Hence, we abstain from applying the constitutional analyses of *Clem II* and *Minder II.*

Several other states have had an opportunity to address the question we face, but their views are divergent. Our neighbor to the north and Washington have held that the use of a private residence for day care did not violate restrictive covenants. *See Beverly Island Ass'n v. Zinger,* 113 Mich.App. 322, 317 N.W.2d 611 (1982); *see also Metzner v. Wojdyla,* 69 Wash.App. 405, 848 P.2d 1313 (1993), *rev. granted,* 122 Wash.2d 1015, 863 P.2d 1352; *see generally Children's Day– Care Use as Violation of Restrictive Covenant,* 29 A.L.R.4th 730 (1984); *but see Walton v. Carignan,* 103 N.C.App. 364, 407 S.E.2d 241, (1991), *trans. denied,* 330 N.C. 123, 409 S.E.2d 611 (enjoined home day care); *Woodvale Condominium Trust v. Scheff,* 27 Mass.App.Ct. 530, 540 N.E.2d 206 (1989), *rev. denied,* 405 Mass. 1205, 543 N.E.2d 21; *Chambers v. Gallaher,* 257 Ga. 795, 364 S.E.2d 576 (1988); *Williams v.*

*Tsiarkezos,* 272 A.2d 722 (Del.Ch.1970). Here, the trial court denied the injunction finding Leigh's day care was a residential use; therefore, we will consider the Michigan and Washington cases.

■ In *Beverly Island,* the pertinent restrictive covenant declared that no lot could be used except for residential purposes. *Beverly Island,* 317 N.W.2d at 612. In Michigan, restrictive covenants are favored by public policy, but they are construed strictly in favor of the free use of property.[3] *Id.* The Michigan Court of Appeals began by noting that the restrictive covenant allowed residential uses rather than prohibiting business or commercial uses. *Id.* at 612. It observed that a restriction allowing residential uses permits a wider variety of uses than a restriction prohibiting commercial or business uses. *Id.* at 613. The rule followed in *Beverly Island* is that the usual, ordinary, and incidental use of property as a place of abode does not violate a residential restriction. *Id.* A business use does not violate a residential use covenant if the nonresidential use was casual, infrequent, or unobtrusive, and was not detrimental to the neighbor's property values. *Id.*

■ The Michigan court examined the legal meaning of "residential use." It recognized that a business or professional use does not constitute a per se violation of a residential use covenant. *Id.* Although compensation for day care may be a factor, its existence or absence is not controlling in determining whether a day care is a residential or commercial use. *Id.* The crucial factor is the activity involved and its comparison to the ordinary and common meaning of use for residential purposes. *Id.*

Applying this standard, the Michigan court first distinguished a group home case that found a violation of the restrictive covenants where the provider boarded ten children and conducted summer school for fifteen children. *See Nerrerter v. Little,* 258 Mich. 462, 243 N.W. 25 (1932). The *Beverly Island* court

---

3. Indiana's view of restrictive covenants is stated differently than Michigan's. In Indiana, restrictive covenants are not favored in the law, but will be enforced in equity if the restrictions are un-

ambiguous and do not violate public policy. *Hrisomalos v. Smith* (1992), Ind.App., 600 N.E.2d 1363, 1366.

viewed the day care activities in caring for seven children. It observed that the children were cared for in the home and yard in the same manner that the provider cared for her own children. *Id.* 317 N.W.2d at 613–14. Although the traffic at the times of the children's arrival and departure increased, the court found that the activities were substantially residential in nature. The court's holding implied that it found that the nonresidential portion of the activities, namely transportation, was noticeably less intrusive than a boarding house and summer school. *Id.* at 614.

Next, the *Beverly Island* court cited an additional factor: the consideration of public policy regarding day care. *Id.* at 614–15 (citing *Bellarmine Hills Ass'n v. Residential Systems Co.,* 84 Mich.App. 554, 269 N.W.2d 673 (1978)). Besides citing a U.S. Department of Health and Human Services study on family day care, *Beverly Island* looked to Michigan legislation to discern public policy. Michigan's licensing statutes reflected its public policy to provide for the protection, growth, and development of children. *Id.* 317 N.W.2d at 614–15 (citing Mich.Comp. Laws § 722.111; Mich.Stat.Ann. § 25.-358(11)). The *Beverly Island* court balanced the level of obtrusiveness and the public policy supporting home day care against the legal meaning of the residential use covenant. *Id.* The court held that the traffic problems were minimally intrusive and that public policy in favor of day care homes overrode the inconveniences. *Id.* at 615. The court concluded that the provider was using her property for residential purposes. *Id.*

We now consider *Metzner.* There, the restrictive covenants also mandated that the property be used for residential purposes only. *Metzner,* 848 P.2d at 1314. The provider obtained a day care license allowing her to care for ten children in her home. The Metzners filed a petition for an injunction to enjoin the day care because the noise bothered them.

■ Following the *Beverly Island* guidelines and distinguishing cases regarding elderly care in residences, the *Metzner* court based its holding on the following factors: 1) the use of the home for day care was inciden-

tal to the residential use, 2) the day care was small and not significantly more intrusive than normal single-family activity, and 3) child care is an activity customarily incident to the residential use of property. *Id.* at 1316–17.

*Metzner* and *Beverly Island* provide reasonable guidelines in order to determine whether the activities on property change its use from its residential character; thus, we adopt their analyses and apply them to the present circumstances. Initially, we acknowledge that unlike the restrictive covenants in *Beverly Island* and *Metzner,* the restrictive covenant here explicitly prohibits commercial uses. Although both cases refer to the lack of such restriction, it was not decisive in determining whether the day care homes were residential uses. *See Metzner,* at 1316; *Beverly Island,* 317 N.W.2d at 612–13. So, even though we note that the restrictive covenants here permit a narrower variety of uses, we still must consider the relevant factors to determine whether Leigh did not use her property for residential purposes only.

The plain and ordinary meaning of "residential purpose" is:

> one in which people reside or dwell, or in which they make their homes. Residential use is distinguishable from commercial or business use. The language of the restriction is concerned with the physical activity carried on upon the premises, and not with the presence or absence of a profit-making motive on the part of the landowner.

*Imler,* 505 N.E.2d at 469 (dissenting opinion) (discussing residential purpose restriction with regard to group home); *see also Residential Management Systems, Inc. v. Jefferson County Plan Comm'n* (1989), Ind.App., 542 N.E.2d 227 (group homes are residential use in context of zoning ordinances). We agree with Justice Krahulik's view, albeit dicta, that unlicensed home day care constitutes a residential use. *See Clem II,* 582 N.E.2d at 786 (dissenting opinion).

Focusing upon the scope of Leigh's activities, we find that she cares for four children in her home in addition to her own and her nephew. Under I.C. 12–7–2–28.6, Leigh's

children and her nephew are not counted for statutory licensing purposes since they are relatives. She receives a total of $245 per week for her services. Leigh's receipt of compensation for caring for children does not render her home day care a business. *See Imler*, 505 N.E.2d at 469. Furthermore, her income from the day care was not a primary source of income. *See Metzner II*, 848 P.2d at 1316. Leigh compared her home day care to having a relative watch one's children. Most often, the children play indoors but occasionally they play outside in the backyard.

The Stewarts complain primarily about the traffic flow incidental to the day care. Two of the five children live across the street from Leigh and walk to day care. The three remaining children are dropped off in the morning at Leigh's and picked up in the evening by their parents in a car. Although the traffic at the times of the children's arrival and departure slightly increased, the activities are substantially residential in nature. *See Beverly Island*, 317 N.W.2d at 614. We cannot find that the slight departure from residential use renders unlicensed home day care to be a commercial use of property even considering the income aspect. We note that these particular restrictive covenants became effective in 1978 when many mothers did not work outside the home and cared for their children in their own homes. We believe, as did Justice Krahulik in *Clem II*, that covenants restricting the use of property to residential purposes and barring commercial use were not intended to prohibit unlicensed home day care. Because it could not be foreseen that day care homes would become so prevalent in light of the significant increase in the number of two working-parent households, we cannot find that these restrictive covenants contemplated the exclusion of unlicensed day care homes as commercial businesses.

We must next discern Indiana's public policy on home day care. The most evident display of Indiana's policy on home day care is the creation of the board for the coordination of child care regulation. *See* IND. CODE 12–17.2–3–1 to –11 (1994). The board studies the necessity for programs to meet the child care needs of Indiana residents and to assess the availability and projected need for safe and affordable child care and then reports its findings to the legislature. I.C. 12–17.2–3–10. One of the board members, Peggy Bakel, who is also the director of Child Care Resources, a non-profit organization that trains day care providers and refers child care services to parents, testified at the trial. She testified that most parents choose home day care when it is available because it simulates the family. Record at 213. In home day care, children are not in an institutionalized setting and can learn and play at their own individual level. She further testified that home day care is more accommodating to parents' different work schedules because it usually offers more flexible hours than day care centers. Record at 215. Bakel related that in Indianapolis her referral agency lists 105 licensed day care homes that care for 984 children daily. None of these day care homes had openings for infants, and only 15 had openings for toddlers. Bakel approximated that there were 250 licensed day care homes in Indianapolis. The need for day care is undeniable where more parents work outside of the home.

In addition, Indiana's enactment of licensing statutes governing home day care shows further public policy concerns for the well-being of our children in day care situations. *See* IND. CODE 12–17.2–5–1 to –36 (1994). It is significant that our legislature has chosen not to regulate home day care with fewer than six children. *See* IND. CODE 12–7–2–28.6 (1994). The deliberate abstinence from monitoring small home day care is indicative of an intent not to place barriers that inhibit these services. Public policy in Indiana clearly favors home day care.

Weighing the minimal obtrusiveness and the public policy supporting home day care against the legal meaning of the residential use covenant here, we find that unlicensed home day care is a residential use and that Leigh's home day care did not violate the restrictive covenants. We add that we are not surprised that the trial court found the hindrance nominal. The record reflects that the activities at Leigh's home day care and its effect upon the neighborhood are not dif-

ferent than the usual comings and goings at any other home. We, as judges, are not required to forget what we know from human experience. Our observations have been that neighborhoods bustle from the hustle of parents heeding their children's needs and attending to their extra-curricular schedules. Were our decision otherwise, it would reflect poorly upon our commitment to one of society's most prized "possessions"—our children.

### IV. Acquiescence

■ Had we found that unlicensed home day care was not a residential use, and therefore, a nonconforming use in violation of the restrictive covenants, we would affirm the trial court's denial of an injunction based upon the Stewarts' acquiescence in other day care homes in the neighborhood. A party defending against an equitable enforcement of a restrictive covenant may plead the defense of acquiescence where the party seeking the injunction acquiesced in similar violations. *Hrisomalos v. Smith* (1992), Ind.App., 600 N.E.2d 1363, 1367. The trial court must consider three factors to determine acquiescence: 1) the location of the objecting landowners relative to both the property upon which the nonconforming use is sought to be enjoined and the property upon which a nonconforming use has been allowed; 2) the similarity of the prior nonconforming use to the nonconforming use sought to be enjoined; and, 3) the frequency of prior nonconforming uses. *Id.* at 1368.

Reviewing the record with these factors in mind, we find ample evidence supporting the defense of acquiescence. Four other day care homes were located within two blocks from the Stewarts. Kenneth admitted that he knew of one home day care at the end of the street and another on the other side. Record at 97. At least two of the day care homes were sufficiently proximate to the Stewarts to sustain the trial court's finding that the Stewarts acquiesced in other neighbors close by providing the same service; thus, the Stewarts were precluded from equitable relief to enjoin Leigh's home day care.

### V. Summary

The trial court erred in finding that the Stewarts had unclean hands and were thereby barred from equitable relief. However, the trial court correctly determined that unlicensed home day care is a residential use and that Leigh's home day care did not violate the restrictive covenants. Even if the home day care were determined to be a commercial activity in violation of the restrictive covenants, the Stewarts were not entitled to injunctive relief because they acquiesced in similar day care homes in the neighborhood. The trial court did not abuse its discretion by refusing to issue an injunction. Both parties' requests for attorney's fees pursuant to Ind. Appellate Rule 15(G) are denied.

Affirmed in part and reversed in part.

NAJAM and FRIEDLANDER, JJ., concur.