EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| Residentes Parkville Sur, Residentes Parkville Norte y otros<br><br>    Peticionarios<br><br>               v.<br><br>Margarita Díaz Luciano, Yolanda Palou y otros<br><br>    Recurridos | Certiorari<br><br>2003 TSPR 69<br><br>159 DPR ____ |

Número del Caso: CC-2001-752


Fecha: 28 de abril de 2003


Tribunal de Circuito de Apelaciones:
                    Circuito Regional II


Juez Ponente:
                    Hon. Jeannette Ramos Buonomo

Abogado de la Parte Peticionaria:
                    Lcdo. Mark Anthony Bimbela


Abogados de la Parte Recurrida:
                    Lcdo. Santiago F. Lampón González
                    Lcdo. José Enrique Colón Santana
                    Lcdo. Edgardo Manuel Román Espada

Materia: Injunction Preliminar, Injunction Permanente; Sentencia
         Declaratoria y Daños y Perjuicios


Este documento constituye un documento oficial del Tribunal Supremo que está sujeto a los cambios y correcciones del proceso de compilación y publicación oficial de las decisiones del Tribunal. Su distribución electrónica se hace como un servicio público a la comunidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Residentes Parkville Sur,
Residentes Parkville Norte
Y Otros

    Peticionarios


       vs.                    CC-2001-752          Certiorari


Margarita Díaz Luciano,
Yolanda Palou y Otros

    Recurridos


Opinión del Tribunal emitida por el Juez Asociado señor FUSTER BERLINGERI.


San Juan, Puerto Rico, a 28 de abril de 2003.


Tenemos la ocasión de resolver si una servidumbre en equidad que limita el uso de determinadas propiedades para fines residenciales permite algún tipo de actividad comercial de forma incidental o accesoria. Además, tenemos la oportunidad de resolver si procede la concesión de daños por violaciones a las condiciones restrictivas de una servidumbre en equidad.

I

El 26 de septiembre de 1996 varios residentes de la Urbanización Parkville[1] en Guaynabo presentaron una demanda

---

[1] La Urbanización Parkville se estableció como una sola y no como Parkville Norte y Parkville Sur. Sin embargo, el tribunal de primera instancia decidió hacer la división de ese modo

ante el Tribunal de Primera Instancia, Sala Superior de Bayamón, contra varios de sus vecinos por el alegado uso comercial que éstos daban a sus residencias. Ello alegadamente en contravención a una servidumbre en equidad debidamente inscrita en el Registro de la Propiedad que grava la referida urbanización. Solicitaron en dicha demanda el remedio de *injunction* para hacer valer el gravamen impuesto sobre sus residencias, y la indemnización correspondiente por los daños que el incumplimiento de las restricciones les había causado.

Los solares que hoy día componen Parkville fueron gravados con 19 cláusulas restrictivas que constan inscritas en el Registro de la Propiedad de Guaynabo desde el 1963. Las cláusulas restrictivas pertinentes al caso de autos disponen como sigue:

> 1. No lot shall be used except for residential purposes. No building shall be erected, altered, placed or permitted to remain on any lot other than one detached single dwelling, one accesory (sic) building and a private garage.

> 8. No noxious or offensive activity shall be carried on upon any lot, nor anything shall be done thereon which may be or may become an annoyance or nuisance to the neighborhood.

> 11. No sign of any kind shall be displayed to the public view on any lot except one professional sign not more than one square foot, one sign of more than five square feet advertising the property for sale

_____

para obtener un mejor manejo del caso dada su complejidad y el gran número de partes involucradas. A esos efectos, en el presente caso sólo se recogen las incidencias de lo ocurrido en el pleito de Parkville Norte por haberse celebrado primero que el de Parkville Sur.

Cabe señalar que a través del proceso se han emitido varias sentencias parciales que han reducido el número de partes en el litigio.

or rent, or signs used by a builder to advertise the property during the construction and sales period.

15.The restrictions established herein shall be enforced by any proceeding at law or equity in the court of competent jurisdiction against any person or persons violation (sic) or attempting to violate any covenant either to restrain violation or to recover damages.

El tribunal de instancia determinó que los siguientes negocios operaban en la urbanización:

1)un centro de cuido diurno para alrededor de 25 niños denominado "Los Serafines" operado por los esposos Priscilla Llenza y Julio César Torres (en adelante los Torres Llenza) en un anexo de su residencia. Éstos poseían un permiso de uso otorgado por la Administración de Reglamentos y Permisos (en adelante A.R.P.E.) para operar dicho centro en un 25% de su propiedad;

2)un centro de cuido de niños y otro de infantes denominados "Little Ranch" y "Little Ranch Babies" respectivamente, operados por Yolanda Palou (en adelante Palou) en dos propiedades suyas ubicadas en la Avenida Washington G-13 y G-14. Dichas propiedades contaban con un permiso de uso de la A.R.P.E. para llevar a cabo tales actividades. El solar G-13 estaba dedicado al cuido de niños de 3 a 4 años y el G-14 al cuido de bebes e infantes de 2 meses a 3 años de edad. Cada centro atendía aproximadamente 60 niños.

3)una oficina de bienes raíces operada por Carmen Varela (en adelante Varela) quien poseía un permiso de uso de la A.R.P.E. para operarla en un 25% de su propiedad.[2]

Ante dicho cuadro fáctico, el 31 de agosto de 2000 el Tribunal de Primera Instancia dictó una sentencia parcial en la cual, entre otras cosas, declaró con lugar la demanda referida antes contra los co-demandados, Palou, Varela y los Torres Llenza, por operar sus respectivos negocios en Parkville en abierta violación a las condiciones restrictivas que gravaban sus propiedades. Ordenó el cese y desista de los centros de cuido "Little Ranch" y "Little Ranch Babies", de la oficina de bienes raíces operada por Varela y del centro de cuidado de niños diurno "Los Serafines". Además, ordenó a los co-demandados a pagar a todos los demandantes la suma global de $34,000 como indemnización por los daños sufridos, más las costas del pleito. La referida indemnización se concedió a pesar de que el foro *a quo* sólo hizo determinaciones de hechos específicas sobre los daños sufridos por los demandantes Migdalia Matos (en adelante Matos) y los esposos José Pizarro y Áurea Zayas (en adelante los Pizarro Zayas), quienes eran vecinos inmediatos de los co-demandados, Torres Llenza y Palou, respectivamente.

_____

[2] Un cuarto negocio dedicado al cuido de envejecientes fue objeto de la demanda original. No obstante, no se encuentra ante nuestra consideración por haber sido desistido a nivel de instancia.

Inconformes con dicha determinación Palou y los Torres Llenza acudieron al Tribunal de Circuito de Apelaciones mediante recursos separados.[3] El 6 de agosto de 2001 el foro apelativo, tras consolidar dichos recursos, emitió una sentencia mediante la cual modificó el dictamen del tribunal de instancia. En síntesis, el tribunal apelativo revocó la sentencia dictada por el foro inferior, en cuanto ordenaba a los Torres Llenza el cese y desista de la operación "Los Serafines" y el pago de las costas del pleito. Determinó que el uso domiciliario limitado a un 25% del área de la propiedad no violaba la condición restrictiva en cuestión. Además, dejó sin efecto los daños concedidos a los demandantes, con excepción de los $5,000 otorgados a los Pizarro Zayas. Dispuso así mismo que dicha cantidad debía ser compensada en su totalidad por Palou, la vecina de los Pizarro Zayas. Por último, impuso las costas del litigio sólo a las co-demandadas Palou y Varela.

Inconformes con el referido dictamen, el 24 de septiembre de 2001 los demandantes (en adelante los peticionarios) acudieron antes nos mediante un recurso de *Certiorari* y alegaron la comisión de los siguientes errores:

A.   ERRÓ EL TRIBUNAL DE CIRCUITO DE APELACIONES AL DETERMINAR SIN NINGUNA EXPLICACIÓN LINGÜÍSTICA QUE LA CLÁUSULA RESTRICTIVA QUE GRAVA LAS PROPIEDADES DE LA URBANIZACIÓN PARKVILLE, EN GUAYNABO, Y QUE LIMITA EL USO PARA FINES RESIDENCIALES NO ES EXCLUYENTE

---

[3] El recurso instado por Varela para revisar la sentencia parcial del Tribunal de Primera Instancia ante el Tribunal de Circuito de Apelaciones fue desestimado por craso incumplimiento con el Reglamento del Tribunal de Circuito de Apelaciones.

TOTALMENTE PORQUE NO EMPLEO LA PALABRA "SOLELY AND EXCLUSIVELY", CITANDO VARIOS CASOS DE DISTINTOS ESTADOS DE LA NACIÓN AMERICANA Y POR LO TANTO ADOLECE DE AMBIGÜEDAD.

B.    ERRÓ EL TRIBUNAL DE CIRCUITO DE APELACIONES AL DETERMINAR QUE AUNQUE EL PERMISO DE USO EXPEDIDO POR ARPE A LOS ESPOSOS PRISCILLA LLENZA Y JULIO CESAR TORRES SOTO NO INDICA QUE ES UNO DE USO DOMICILIARIO, INFIERE QUE EL ORGANISMO ADMINISTRATIVO CONCEDIÓ EN REALIDAD UNA AUTORIZACIÓN DE USO DOMICILIARIO ALEGADAMENTE PERMITIDA A TRAVÉS DE LA SECCIÓN 83.02 DEL REGLAMENTO DE ZONIFICACIÓN, REGLAMENTO DE PLANIFICACIÓN NÚM. 4 DE 16 DE SEPTIEMBRE DE 1992.

C.    ERRÓ EL TRIBUNAL DE CIRCUITO DE APELACIONES AL DEJAR SIN EFECTO DETERMINACIONES DE HECHOS DEL TRIBUNAL DE PRIMERA INSTANCIA DESCARTANDO CON ELLO LA ADJUDICACIÓN DE CREDIBILIDAD QUE LE MERECIERA EL TESTIMONIO DE VARIOS TESTIGOS, YA QUE LA PRUEBA NO SE CIRCUNSCRIBIÓ A PRUEBA DOCUMENTAL.

D.    ERRÓ EL TRIBUNAL DE CIRCUITO DE APELACIONES AL ELIMINAR LA CUANTÍA CONCEDIDA EN DAÑOS A VARIOS DE LOS DEMANDANTES.

El 15 de marzo de 2002, le concedimos a los recurridos un término para que mostraran causa por la cual no debíamos expedir el auto solicitado y revocar la sentencia del 6 de agosto de 2001 del Tribunal de Circuito de Apelaciones. Los Torres Llenza presentaron su escrito el 18 de abril de 2002; Palou, luego de solicitar una prórroga, presentó el suyo el 24 de abril de 2002. Con el beneficio de la comparecencia de las partes, pasamos a resolver.

II

A. Las Servidumbres en Equidad

Como es sabido, la figura jurídica conocida como servidumbre en equidad fue reconocida en nuestro sistema de derecho puertorriqueño desde inicios del siglo pasado en

Glines v. Matta, 19 D.P.R. 409 (1913). A pesar de tener su origen en el derecho angloamericano, dicha figura ha ido evolucionando en nuestro ordenamiento jurídico y tiene hoy día sustantividad propia. Véase, Asoc. V. Villa Caparra v. Iglesia Católica, 117 D.P.R. 346, 352 (1986). En términos generales, una servidumbre en equidad consiste de unas restricciones y condiciones que limitan el uso de terrenos, que operan a beneficio de los presentes y futuros propietarios, mediante las cuales se imponen cargas o gravámenes especiales, como parte de un plan general para el desarrollo y preservación de una urbanización residencial. Véase, Colón v. San Patricio Corporation, 81 D.P.R. 242, 250 (1959).

Según su configuración actual, para su validez y eficacia se requiere que las limitaciones referidas sean razonables, que se establezcan como parte de un plan general de mejoras, que consten de forma específica en el título de la propiedad, y que se inscriban en el Registro de la Propiedad. Lawton v. Rodríguez, 35 D.P.R. 487 (1926). Los dueños de predios sujetos a servidumbres en equidad pueden hacer efectivos sus derechos e impedir violaciones a las limitaciones impuestas a través del recurso de injunction. Glines v. Matta, supra. Contra tal recurso un demandado puede oponer todas las defensas que le otorguen los principios de equidad: (1) consentimiento (acquiescence); (2) conciencia impura (unclean hands); (3) incuria (laches); (4) impedimento (estoppel). Asoc. V. de Villa Caparra v. Iglesia Católica, supra, págs. 353-54. También puede el demandado plantear como defensa que la

servidumbre se ha extinguido, o que ha sido modificada, si existe alguna de las varias circunstancias o causas por razón de las cuales las servidumbres en equidad pueden extinguirse o modificarse, según las hemos identificado antes en nuestros pronunciamientos sobre el particular. Véase, Asoc. V. Villa Caparra v. Iglesia Católica, *supra*, págs. 354-58; y Colón v. San Patricio Corporation, *supra*, págs. 261-65.[4]

Con frecuencia, la servidumbre en equidad es utilizada "en nuestra jurisdicción para establecer restricciones a la propiedad a fin de asegurar que la configuración arquitectónica o urbanística de un determinado proyecto privado se conserve dentro de los parámetros establecidos." M. J. Godreau y A. I. García Saúl, *Servidumbres y Conservación*, 67 REV. JUR. U.P.R. 249, 301 (1998). Se reconoce que las cláusulas restrictivas que gravan las urbanizaciones residenciales tienen como finalidad preservar el valor, "la belleza, la comodidad y la seguridad del reparto residencial", Sands v. Ext. Sagrado Corazón, Inc., 103 D.P.R. 826, 827 (1975), al limitar las facultades de los futuros adquirentes de los solares y de las viviendas en cuanto a hacer obras

---

[4] Las servidumbres pueden extinguirse o modificarse en los siguientes casos: (1) por acuerdo de los interesados; (2) por efecto del tiempo o por realizarse la condición si así se constituyeron; (3) por confusión; (4) por renuncia o abandono de los propietarios que reciben los beneficios de la servidumbre; (5) por expropiación forzosa si los gravámenes son incompatibles con el uso público del inmueble expropiado, y (6) cuando cambios radicales del vecindario no sólo hacen la restricción irrazonable y opresiva para el dueño del predio sirviente, sino también destruyen el valor que la restricción tenía para el dueño del predio dominante, por lo cual resulta imposible alcanzar los fines que perseguía la servidumbre. Asoc. V. de Villa Caparra v. Iglesia Católica, *supra*, pág. 354.

nuevas, efectuar cambios en las ya hechas, y delimitar los usos a los que puede ser destinada una propiedad. *Id.*

En términos jurídicos, la servidumbre en equidad es considerada un contrato entre las partes, ya sea porque éstas acuerdan gravar sus propiedades para delimitar su uso o el tipo de edificación que se puede efectuar sobre éstas; o porque adquirentes posteriores de la propiedad gravada, conociendo las restricciones inscritas en el Registro de la Propiedad, aceptan someterse a éstas. Véase, Asoc. Vec. Urb. Huyke v. Bco. Santander, res. el 28 de junio de 2002, 157 D.P.R. ___, 2002 TSPR 97, 2002 JTS 104; Rodríguez et als. v. Gómez et al., res. el 6 de marzo de 2002, 156 D.P.R. ___, 2002 TSPR 28, 2002 JTS 34; Cond. Prof. S.J. H. Centre v. P.R.F., Inc., 133 D.P.R. 488 (1993); Sands v. Ext. Sagrado Corazón, Inc., *supra*; Colón v. San Patricio Corporation, *supra*.

Para que una propiedad inmueble sea gravada válidamente mediante una servidumbre en equidad, sus cláusulas restrictivas deben constar en una escritura pública, y, según se ha señalado ya, deben inscribirse en el Registro de la Propiedad. En virtud de ello, las cláusulas restrictivas de una servidumbre en equidad adquieren un rango de *contratos privados de naturaleza real*, pues "[u]na vez son inscritas en el Registro de la Propiedad, se considera que las restricciones constituyen derechos reales oponibles *erga omnes*, lo que crea entre los predios afectados 'una relación de servidumbres recíprocas, pues cada lote o solar es predio

dominante, a la vez que sirviente, con relación a los demás lotes o solares de la urbanización'". Asoc. V. Villa Caparra v. Iglesia Católica, *supra*, 353 (citando en parte a Vélez Torres, *Curso de Derecho Civil*, 1983, T. II, pág. 417; Carrillo Norat v. Camejo, 107 D.P.R. 132, 136 (1978). A esos efectos, por ser contratos privados de naturaleza real, el principio rector para determinar el significado y el alcance de las condiciones restrictivas de una servidumbre en equidad es conocer *la voluntad real de las partes al momento de establecer las restricciones sobre las propiedades*. Asoc. Vec. Urb. Huyke v. Bco. Santander, *supra*; Rodríguez et als. v. Gómez et al., *supra*; Cond. Prof. S.J. H. Centre v. P.R.F., Inc., *supra.* En otras palabras, lo realmente importante al interpretar las cláusulas restrictivas de la servidumbre en equidad es conocer *cuál fue el verdadero fin que se perseguía al gravar las propiedades mediante la servidumbre en equidad.*

Una vez se reconoce la validez y vigencia de las cláusulas restrictivas de una servidumbre en equidad en un caso particular, los tribunales deben hacer cumplir a cabalidad los propósitos del acuerdo al que las partes han aceptado someterse al adquirir la propiedad gravada. Dicha normativa tiene como finalidad preservar la autonomía de la voluntad de las partes reflejada en las cláusulas restrictivas de la servidumbre en equidad. Debido a ello, los tribunales no tienen facultad para soslayar dicha voluntad por criterios ajenos a ésta, salvo que sea contraria a la ley, a la moral o al orden público. Véase, Art. 1207 del Código Civil de Puerto

Rico, 31 L.P.R.A. sec. 3372; Glines v. Matta, *supra,* pág. 417; Colón v. San Patricio Corporation, *supra,* pág. 266, esc. 6. Sabido es, que en el ámbito de las obligaciones y contratos, es una doctrina fundamental que cuando los términos de un contrato son claros, y no dejan lugar a dudas sobre la intención de los contratantes, no cabe recurrir a reglas de interpretación. Art. 1233 del Código Civil de Puerto Rico, 31 L.P.R.A. sec. 3471; Trinidad v. Chade, res. el 18 de enero de 2001, 153 D.P.R. ___, 2001 TSPR 7, 2001 JTS 10.

En resumen, pues, los tribunales deben hacer cumplir a cabalidad la voluntad de las partes reflejada en las cláusulas restrictivas de una servidumbre en equidad válida y vigente, salvo que ésta sea contraria a la ley, a la moral o al orden público. Para lograr dicho propósito lo esencial es conocer *cuál era el verdadero fin que se perseguía al gravar las propiedades mediante la servidumbre en equidad.*

B. Compatibilidad de los Cuidos de Niños en el Hogar y las Servidumbres en Equidad

Pasamos ahora a examinar concretamente si operar un cuido de niños en una propiedad residencial constituye un uso no residencial incompatible con una servidumbre en equidad como la que aquí nos concierne. Por carecer en nuestra jurisdicción de precedentes que atiendan específicamente la controversia ante nos, por el origen de la figura en cuestión conviene acudir a la jurisprudencia angloamericana que ha tratado el asunto extensamente. Véase, *Children's Day Care Use As Violation of Restrictive Covenant*, 81 ALR5th 345 (2000);

*Application of Private Covenants Restricting Use of Property to Residential Purposes*, 43 AM JUR PROOF OF FACTS 3d 473, § 17 (1997 & Supl. 2002).

Por un lado, algunos tribunales estatales han entendido que los cuidos de niños en los hogares son compatibles con las cláusulas restrictivas que limitan el uso de las residencias para usos exclusivamente residenciales. Por ejemplo, en <u>Shoaf v. Bland</u>, 69 S.E.2d 258 (Ga. 1952) el Tribunal Supremo de Georgia denegó la expedición de una orden de *injunction* preliminar que intentaba impedir la operación de un *kindergarten* en una residencia. Ello a pesar de que existían restricciones sobre la propiedad que limitaban su uso para fines residenciales y que prohibían cualquier actividad que constituyera un estorbo público. El aludido foro resolvió que bajo las circunstancias particulares del caso, la operación del *kindergarten* no destruía el carácter residencial de la propiedad, debido a que dicha actividad no constituía un estorbo público. Véase, además, <u>Stewart v. Jackson</u>, 635 N.E.2d 186 (Ind. App. 1994); <u>Beverly Island Ass'n v. Zinger</u>, 317 N.W.2d 611 (Mich. App. 1982); <u>Davis v. Hinton</u>, 374 S.W.2d 723, 727 (Tex. Civ. App. Tyler 1964).

Lo anterior no obstante, la norma mayoritaria en los tribunales supremos estatales norteamericanos es la que afirma que operar un cuido de niño en una residencia es incompatible con una servidumbre en equidad que restringe el uso de la propiedad para fines residenciales. Así, pues, en <u>Berry v. Hemlepp</u>, 460 S.W.2d 352 (Ky. 1970) el tribunal de mayor

jerarquía de Kentucky prohibió la operación de un cuido de niños diurno en el que se atendían entre 15 a 20 niños, aún cuando el propietario residía en la misma estructura. Al resolver de ese modo expresó:

> It does not appear necessary to become too deeply immersed in legal refinements and subtle meanings of words or omissions. …
> … The objective of the covenants was clearly to restrict the use of theses lots to residential use.
> … Exclusionary adjectives or adverbs were not here required. All that is needed in the present case is a fair and common-sense approach to the objective sought by the language used. The fact that appellant resides in the house is irrelevant to the question of whether it is utilized for a nonresidential purpose.

Berry v. Hemlepp, *supra,* pág. 353.

Igualmente, en Terrien v. Zwit, 648 N.W.2d 602 (Mich. 2002) el Tribunal Supremo de Michigan se enfrentó a la controversia de si una servidumbre en equidad, que sólo permite usos residenciales y que expresamente prohíbe los usos comerciales, industriales o de negocios, es óbice para que los demandados pudieran operar un cuido de niños familiar en su hogar.[5] Según el referido foro, operar un cuido de niños familiar, con fines pecuniarios, en una residencia constituye un uso comercial de la propiedad. *Id*. págs. 606-07. Además, enfatizó que no era correcto lo expresado por el tribunal apelativo intermedio de Michigan en Beverly Island Ass'n v. Zinger, *supra*, en cuanto a que en dicho estado existía una política pública a favor de los cuidos de niños en los hogares

---

[5] Según la ley de Michigan "a 'family day care home' means a 'private home in which 1 but fewer than 7 minor children are received for care and supervision for periods of less than 24 hours a day....'" Terrien v. Zwit, *supra*, esc. 2.

que hacía prácticamente imposible darle efectividad a las
servidumbres en equidad que prohibían dicho uso.
Específicamente la Corte Suprema de Michigan señaló:

> "[There is nothing] in our constitutions, statutes,
> or common law that supports [a finding] that a
> covenant prohibiting 'family day care homes' is
> contrary to the public policy of Michigan. ...
> [T]hat 'family day care homes' are *permitted* by law
> does not indicate that private covenants barring
> such business activity are contrary to public
> policy. ... There is a significant distinction
> between something being permitted or even encouraged
> by law and something being required or prohibited by
> law."

Terrien v. Zwit, *supra*, págs. 609-10. En cambio, señaló que
convenir el establecimiento de restricciones a la propiedad
con fines residenciales, era parte integral del derecho de
propiedad de las personas. *Id*. esc. 20.[6] Para otras decisiones
similares de otros tribunales estatales norteamericanos,
véase, Metzner v. Wojdyla, 886 P.2d 154 (Wash. 1994); Chambers
v. Gallaher, 364 S.E.2d 576 (Ga. 1988); Voyles v. Knight, 138
S.E.2d 565 (Ga. 1964); Walton v. Carignan, 407 S.E.2d 241
(N.C. App. 1991); Woodvale Condominium Trust v. Scheff, 540

---

[6] "[C]ourts cannot disregard private contracts and
covenants in order to advance a particular social good. ...
[There is a] strong competing public policy, which *is* well-
grounded in the common law of Michigan, supporting the right
of property owners to create and enforce covenants affecting
their own property. ... It is fundamental principle, both with
regard to our citizens' expectations and in our jurisprudence,
that property holders are free to improve their property. We
have said that property owners are free to attempt to enhance
the value of their 'property in any lawful way, by physical
improvement, psychological inducement, *contract*, or
otherwise.' Covenants running with the land are legal
instruments utilized to assist in that enhancement. A covenant
is a contract created with the intention of enhancing the
value of property, and, as such, it is a 'valuable property
right.' *Id*. págs. 610-11.

N.E.2d 206 (Mass. App. Ct. 1989); Cook v. Hoover, 428 So.2d 836 (La. Ct. App. 5th Cir. 1983); Matthews v. Olson, 212 So.2d 357 (Fla. Dist. Ct. App. 2d Dist. 1968); Williams v. Tsiarkezos, 272 A.2d 722 (Del. Ch. 1970).

Nos parece razonable adoptar la norma seguida por la mayoría de los tribunales norteamericanos, por ser la más cónsona con lo dispuesto en nuestro propio ordenamiento jurídico relativo a la contratación, que establece que la voluntad de los contratantes debe ser preservada, salvo que ésta sea contraria a la ley, a la moral o al orden público. Art. 1207, *supra*.

III

Pasemos ahora a aplicar al caso de autos la normativa reseñada antes.

En síntesis, los peticionarios en su primer señalamiento de error han alegado que erró el Tribunal de Circuito de Apelaciones al concluir que las cláusulas restrictivas en controversia no impedían que los Torres Llenza operaran **de forma incidental** el cuido de niños "Los Serafines" en un 25% de su residencia. Tienen razón.

De un análisis integral de las cláusulas restrictivas bajo estudio, unido a las determinaciones de hecho del tribunal de instancia, podemos colegir que la clara intención del desarrollador al gravar las residencias de la Urbanización Parkville fue limitar el uso de los solares en cuestión para

ser utilizados en su totalidad única y exclusivamente como vivienda.[7]

El claro propósito de la servidumbre en equidad del caso de autos era lograr que los futuros adquirentes de Parkville pudieran establecer allí su domicilio o morada sin los inconvenientes que en ocasiones conlleva la operación de negocios dentro de los repartos residenciales o en lugares adyacentes a los mismos. Como expresamos en Soto Vázquez v. Vázquez Torres, 138 D.P.R. 282, 292 (1995), "cuando en una escritura se restringe el uso o destino de [una propiedad] a fines residenciales, la estrechez del concepto informa clara y debidamente al adquirente las limitaciones impuestas a su derecho propietario." No cabe duda, pues, que el fin perseguido a través de las cláusulas restrictas era preservar el carácter residencial de Parkville.

Conforme con el propósito referido, la prohibición en cuestión incluye **cualquier uso no residencial** aunque sólo sea de forma supuestamente incidental o accesoria. No puede haber duda alguna que la finalidad de la servidumbre en equidad se extendía a prohibir el uso de una parte significativa de la residencia (25%) para el cuido de 25 niños. Resolver lo

---

[7] Como han expresado varios tribunales angloamericanos:

> "...Where the term 'residential purposes' is left undefined in a restrictive covenant, which is virtually always the case, many courts have stated that this language was designed to 'limit the use of the property to living purposes as distinguished from business or commercial purposes.'"

43 AM JUR PROOF OF FACTS 3d 473, 489-90, § 7 (1997).

contrario sería soslayar la autonomía de la voluntad de las partes, lo cual no estamos facultados a hacer, salvo que ésta sea contraria a la ley, a la moral o al orden público. Art. 1207, *supra*. Véase, además, Metzner v. Wojdyla, *supra*.[8]

Erró, pues, el Tribunal de Circuito de Apelaciones al resolver que la cláusula número 1 del caso de autos, es una cláusula muy general que no tiene el alcance de prohibir la operación de un cuido de niños de forma incidental. Una vez el foro apelativo concluyó correctamente que la operación de los cuidos de niños "Little Ranch" y "Little Ranch Babies" constituía un uso no residencial, de igual forma debió

---

[8] El caso de autos es similar al resuelto por el Tribunal Supremo de Washington en Metzner v. Wojdyla, *supra*, que determinó que el demandado en dicho caso no podía operar un cuido de niños en su hogar a pesar de contar con la correspondiente licencia para ello y de que la operación del cuido era incidental al uso de la propiedad. De hecho, la residencia estaba gravada con una cláusula restrictiva muy similar a la cláusula restrictiva número 1 del caso ante nos. La cláusula bajo análisis en Metzner v. Wojdyla disponía:

> 1. *Said property shall be used for residential purposes only.* No building shall be erected, placed, altered, or permitted to remain on any lot other than one detached single-family dwelling with a private garage … without the consent of the grantor.

Ante esa situación, el referido foro señaló que el objetivo principal al interpretar una cláusula como la antes transcrita era determinar la intención de las partes y que para poder determinar dicha intención era necesario acudir al uso ordinario y común de las palabras. *Id*. pág. 157. A esos efectos, concluyó que operar un cuido de niños en el hogar con fines pecuniarios equivale a operar un negocio, lo cual es contrario a la restricción impuesta sobre la propiedad. Además, señaló que era inmaterial tomar en cuenta que el demandado vivía en la residencia y que la operación del cuido de niños pudiera ser incidental al uso de la propiedad. *Id*. págs. 157-58.

concluir que la operación de los "Los Serafines" también era un uso no residencial.

IV

<u>Los Permisos de Uso y la Servidumbre en Equidad</u>

Pasemos entonces a analizar el segundo error señalado por los peticionarios. Éstos han alegado que erró el foro apelativo al resolver que el permiso de uso otorgado por la A.R.P.E. a los esposos Torres Llenza, era un permiso domiciliario. En efecto, el tribunal apelativo basó parte de su determinación de que el uso dado a la residencia de los Torres Llenza estaba autorizado, en que el permiso de uso concedido por la A.R.P.E. permitía utilizar cierto porcentaje de su residencia para llevar a cabo actividades profesionales o de negocios. Veamos si tienen razón.

La sección 99.00 del Reglamento de Zonificación de 1992 establece que el propósito de las excepciones es "identificar ... usos compatibles con el carácter esencial del distrito, que en forma discrecional podrían autorizarse sin detrimento al propósito del distrito." Reglamento de Planificación Núm. 4, Sec. 99.02, 16 de septiembre de 1992. Por su parte, la sección 99.05(2) de dicho reglamento establece que la A.R.P.E., mediante excepción, puede otorgar un permiso de uso para operar un centro de cuido de niños diurno en cualquier distrito residencial.

No obstante, en derecho está firmemente establecido que la obtención de un permiso de uso de una agencia administrativa "no tiene el efecto ni el alcance de anular

restricciones privadas que resultan inconsistentes con el permiso" concedido. Sabater v. Corp. Des. Eco. Del Pastillo, Inc., 140 D.P.R. 497, 508 (1996); Rodríguez v. Twin Towers Corp., 102 D.P.R. 355, 356 (1974); Pérez v. Pagán, 79 D.P.R. 195, 198 (1956); Sands v. Ext. Sagrado Corazón, Inc., *supra,* pág. 831; Colón v. San Patricio Corporation, *supra,* págs. 262-69; Asoc. V. Villa Caparra v. Iglesia Católica, *supra,* pág. 353.

En nuestro ordenamiento no existe ley o reglamento que le conceda autoridad a las agencias administrativas para adjudicar los derechos de las partes que surgen de restricciones privadas. Luan Investment Corp. v. Román, *supra,* pág. 551; Pérez v. Pagán, *supra,* pág. 199; Asoc. V. Villa Caparra v. Iglesia Católica, *supra,* pág. 353 esc. 6. De modo que, una servidumbre en equidad retiene toda su vigencia a pesar de que una agencia administrativa conceda un permiso de uso contrario a dicho gravamen. Asoc. Vec. Urb. Huyke v. Bco. Santander, *supra.*

El principio antes expuesto no sólo es reconocido en nuestra jurisdicción sino también en algunos estados de la unión americana. A modo de ejemplo, podemos señalar que el Tribunal Supremo de Michigan en Terrien v. Zwit, *supra,* entendió que la operación de un centro de cuido de niños con fines pecuniarios constituía la operación de un negocio, lo cual era contrario al concepto de uso residencial.[9] Esto, a

---

[9] Igualmente, en Puerto Rico hemos resuelto que "el término [uso comercial] ... en la mayoría de los casos

pesar de que en dicho estado existía una ordenanza de zonificación que claramente establecía que un "'family day care home' 'shall be considered a residential use of property for the purposes of zoning....'". *Id*. esc. 14. A esos efectos, dicho Tribunal expresó:

> "Therefore, even *if* the operation of a 'family day care homes,' is a 'favored use,' this is an insufficient reason for disregarding a covenant prohibiting the operation of 'family day care homes' on the subject property."

En resumen, pues, no es suficiente con que el reglamento de una agencia administrativa permita determinado uso en una residencia o propiedad para que dicho uso pueda ser permitido en una propiedad gravada con una servidumbre en equidad que prohíba dicho uso. En esos casos, como norma general, prevalece el convenio alcanzado por las partes a través de la servidumbre en equidad sobre el permiso de uso otorgado por la agencia administrativa.

A esos efectos, resolvemos que las secciones del Reglamento de Zonificación que permiten operar cuidos de niños en residencias sólo son aplicables a repartos residenciales que no están gravados con una servidumbre en equidad que prohíba dicho uso. Por lo tanto, erró el Tribunal de Circuito de Apelaciones al actuar de modo contrario a lo antes expuesto.

---

equivale a una negación de un uso residencial...." Soto Vázquez v. Vázquez Torres, *supra,* pág. 293.

V

Daños por Violaciones a la Servidumbre en Equidad

Los peticionarios han alegado que erró el Tribunal de Circuito de Apelaciones al eliminar la mayor parte de las cuantías en daños que les fue concedida. El foro apelativo, en efecto, revocó la determinación del tribunal de instancia de conceder daños a los peticionarios por el incumplimiento de las obligaciones contractuales al amparo del Art. 1054 del Código Civil de Puerto Rico, con excepción de los daños otorgados a los Pizarro Zayas.

Luego de examinar a fondo las cláusulas restrictivas del caso de autos, nos parece evidente que la intención del desarrollador al establecer la servidumbre en equidad fue asegurar que los compradores de esa área residencial pudieran hacer valer dicha servidumbre tanto mediante el recurso de *injunction* como solicitando daños, cuando ello procediese. El propósito de las disposiciones contractuales en cuestión fue ofrecer a los compradores todos los medios posibles para garantizar la permanencia de la urbanización como una residencial.

Debe notarse, además, que tratamos aquí con una situación en la cual al reclamante se le está privando del pleno disfrute de su propiedad al usarse el vecindario para fines comerciales, y esa privación alegadamente le ha causado daños particulares. Son dos, pues, los intereses a proteger; son dos las faltas sufridas por el reclamante. Por ello, son dos los

remedios a que tiene derecho.[10] A esos efectos, resolvemos que como norma general no existe razón alguna para negarle a las partes ambos remedios, *injunction* y daños.

De acuerdo a los principios antes expuestos debemos resolver cuáles de los peticionarios, si alguno, tiene derecho a recibir indemnización.

De las determinaciones de hechos realizadas por el tribunal de instancia se desprende que los únicos peticionarios que sufrieron daños específicos, que ameriten la concesión de una indemnización a causa del incumplimiento de las obligaciones contractuales, fueron los Pizarro Zayas y Matos. Los demás peticionarios alegaron daños con carácter sumamente genéricos que no ameritan la concesión de una indemnización. Véase, Pérez v. Sampedro, 86 D.P.R. 526, 530 (1962); Paniagua v. Sobrinos de Ezquiaga, 14 D.P.R. 803, 820 (1908). De hecho, los únicos peticionarios que residen cerca del cuido de niños "Little Ranch" y "Los Serafines" son los Pizarro Zayas y Matos, respectivamente. El resto de los peticionarios, vive a una distancia considerable de los referidos cuidos, por lo que no es de extrañar que de las determinaciones de hechos antes aludidas surja que dicha actividad sólo les causó unas molestias de tipo general.

---

[10] Uno es el de *injunction*; el otro es la compensación por aquellos daños causados por la conducta de los demandados, al amparo del Art. 1802 del Código Civil de Puerto Rico que, según hemos resuelto antes, establece una fuente de obligación "que no admite limitación ni excepción de clase alguna" y que incorpora un concepto de responsabilidad "infinitamente abarcador, tan amplio y abarcador como suele ser la conducta humana", Santini Rivera v. Serv Air, Inc., 137 D.P.R. 1, 8 (1994).

En virtud de lo anterior, resolvemos que Palou debe indemnizar a los Pizarro Zayas por $5,000, según la determinación de daños del tribunal de instancia. Igualmente, los Torres Llenza deben indemnizar a Matos por $3,000. A esos efectos, debe modificarse la concesión de daños realizada por el Tribunal de Circuito de Apelaciones.

VI

Por los fundamentos antes expuestos, procede que se dicte sentencia para modificar el dictamen emitido por el foro apelativo el 6 de agosto de 2001 y ordenar (1) el cese y desista del cuido de niños "Los Serafines" operado por los Torres Llenza; y (2) el pago de una indemnización de $3,000 a Matos por los Torres Llenza. Se devuelven los autos al tribunal de instancia para que continúen los procedimientos conforme con lo resuelto aquí.

Se dictará sentencia de conformidad.

JAIME B. FUSTER BERLINGERI
JUEZ ASOCIADO

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Residentes Parkville Sur,
Residentes Parkville Norte
Y Otros

    Peticionarios

       vs.                  CC-2001-752      Certiorari

Margarita Díaz Luciano,
Yolanda Palou y Otros

    Recurridos

SENTENCIA

San Juan, Puerto Rico, a 28 de abril de 2003.

Por los fundamentos expuestos en la Opinión que antecede, la cual se hace formar parte de la presente Sentencia, se dicta sentencia para modificar el dictamen emitido por el foro apelativo el 6 de agosto de 2001 y se ordena (1) el cese y desista del cuido de niños "Los Serafines" operado por los Torres Llenza; y (2) el pago de una indemnización de $3,000 a Matos por los Torres Llenza. Se devuelven los autos al tribunal de instancia para que continúen los procedimientos conforme con lo resuelto aquí.

Lo pronunció, manda el Tribunal y certifica la Secretaria del Tribunal Supremo. El Juez Asociado señor Rivera Pérez concurre sin opinión escrita.

Patricia Otón Olivieri
Secretaria del Tribunal Supremo