EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| Dorado del Mar Estates Homeowners Association, Inc.<br><br>Peticionaria<br><br>v.<br><br>Carlos Weber y su esposa Abigail Marrero Pérez<br><br>Recurridos | Certiorari<br><br>2019 TSPR 137<br><br>203 DPR ____ |

Número del Caso: CC-2017-467

Fecha: 6 de agosto de 2019

Tribunal de Apelaciones:

   Región Judicial de Bayamón y Carolina, Panel VI

Abogados de la parte peticionaria:

   Lcdo. Luis Muñiz Arguelles
   Lcdo. Manuel De J. González Hernández

Abogado de la parte recurrida:

   Lcdo. José A. Aldrich Méndez

Materia: Ley de Control de Acceso - Asociación de Residentes, Cuotas de Mantenimientos, Derecho de Corporaciones, Artículos de Incorporación y Estatutos Corporativos.

Este documento constituye un documento oficial del Tribunal Supremo que está sujeto a los cambios y correcciones del proceso de compilación y publicación oficial de las decisiones del Tribunal. Su distribución electrónica se hace como un servicio público a la comunidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | | |
|---|---|---|
| Dorado del Mar Estates Homeowners Association, Inc.<br><br>    Peticionaria<br><br>        v.<br><br>Carlos Weber y su esposa Abigail Marrero Pérez<br><br>    Recurridos | CC-2017-467 | *Certiorari* |

Opinión del Tribunal emitida por la Jueza Asociada señora Pabón Charneco.

En San Juan, Puerto Rico, a 6 de agosto de 2019.

Este recurso requiere que examinemos quién puede ser miembro de Dorado del Mar Estates Homeowners Association Inc. y quiénes tienen la obligación de pagar las cuotas establecidas por dicha entidad para la operación y el mantenimiento del sistema de control de acceso que opera en Dorado del Mar. Tras analizar los argumentos de las partes, el derecho aplicable y los hechos particulares del caso, adelantamos que los requisitos para ser miembros de Dorado del Mar Estates Homeowners Association Inc. son los establecidos en su Certificado de Incorporación, según enmendado. Asimismo, resolvemos que todos los propietarios de Dorado del Mar que autorizaron la formalización y convalidación del sistema de control de acceso están obligados a pagar las cuotas para su operación y mantenimiento.

I

Como cuestión de umbral, y por ser pertinente a la controversia que nos ocupa, es indispensable considerar el origen de Dorado del Mar al resolver el recurso ante nos. Dorado del Mar es un complejo compuesto por varios desarrollos y urbanizaciones que se construyó en la década de los 70 en dos (2) fincas del Municipio de Dorado, la 1573 y la 1951. El 23 de noviembre de 1971 el desarrollador de Dorado del Mar otorgó la Escritura Núm. 60 intitulada *Deed of Restrictive Covenants* ("Escritura Núm. 60") ante el notario Luis Sánchez Vilella. Allí, hizo constar que era dueño de una parcela de 65.64 cuerdas sita en Dorado en la cual desarrollaría el proyecto Dorado del Mar Estates.[1] Inscribió la Escritura Núm. 60 en la finca 1951 y, al así hacerlo, la gravó con unas condiciones restrictivas. Dorado del Mar Estates, una de las urbanizaciones que componen Dorado del Mar, surgió de una segregación de la finca 1951, por lo que está gravada con la Escritura Núm. 60.

Desde sus inicios, el control de acceso de Dorado del Mar ha sido operado por Dorado del Mar Estates Homeowners Association, Inc. ("la Asociación"), corporación inscrita en el Registro de Corporaciones del Departamento de Estado bajo el número 8650-SF desde el 1 de septiembre de 1976.[2] Desde

---

[1] La Escritura Núm. 60 del 23 de noviembre de 1971 otorgada ante el notario Luis Sánchez Vilella ("Escritura Núm. 60") fue enmendada por la Escritura Núm. 7 del 29 de febrero de 1972 otorgada ante la notaria Manuelita M. de Rosado. Sin embargo, la enmienda no alteró el requisito de membresía establecido en la Escritura Núm. 60 objeto de este recurso.

[2] Dorado del Mar Estates Homeowners Association, Inc. ("la Asociación"), inscrita en el Registro de Corporaciones del Departamento de Estado bajo

entonces, la Asociación se ha encargado de cobrar las cuotas para la operación y el mantenimiento del sistema que da acceso a las urbanizaciones que componen Dorado del Mar. Sin embargo, ante las gestiones de cobro que la Asociación ha realizado a través del tiempo, algunos residentes morosos impugnaron la capacidad de cobro de la Asociación. Particularmente, sostuvieron que la Asociación no puede cobrar las cuotas de mantenimiento porque no está compuesta exclusivamente por residentes de Dorado del Mar Estates, conforme a lo dispuesto en la Escritura Núm 60.

El Tribunal de Apelaciones evaluó la capacidad de cobro de la Asociación en varias ocasiones. Los pronunciamientos del foro apelativo intermedio son medulares a los planteamientos de las partes y a la resolución del caso ante nos. Por lo tanto, los reseñamos brevemente.

En Dorado del Mar Estates Homeowners Association, Inc. v. Myrna Cordero, et al., KLAN201000645,[3] el 15 de septiembre de 2010, el Tribunal de Apelaciones revisó una Sentencia en la que el foro primario desestimó una Demanda de Sentencia Declaratoria que presentó la Asociación. El foro apelativo

---

el número 8650-SF fue inscrita originalmente bajo el nombre Dorado del Mar Homeowners Association, Inc. La Asociación cambió su nombre a Dorado del Mar Estates Homeowners Association Inc. el 14 de mayo de 2007, según surge del Registro de Corporaciones del Departamento de Estado, del Certificado de Enmienda del Certificado de Incorporación de Dorado del Mar Estates Homeowners Association, Inc. una Corporación Sin Fines de Lucro y Sin Acciones de Capital suscrito por el Presidente de la Junta de Directores de la Asociación el 27 de abril de 2017, y de la Certificación del Departamento de Estado suscrita el 14 de mayo de 2007 por el entonces Secretario de Estado, Hon. Fernando J. Bonilla. Véase: Petición de *Certiorari*, Apéndice, págs. 137 y 138.

[3] *Dorado del Mar Estates Homeowners Association, Inc. v. Myrna* Cordero, et al., KLAN201000645 (Sentencia del 15 de septiembre de 2010).

intermedio delimitó las controversias a resolver mediante la formulación de las interrogantes siguientes: ¿Quiénes tienen derecho potestativo a ser miembros de la Asociación? ¿Quiénes están obligados a pagar una cuota para sufragar el control de acceso de Dorado del Mar? ¿Quiénes están obligados a cumplir con las servidumbres en equidad de la Escritura Núm. 60? Analizó la Ley de Corporaciones de 1995, la Ley de Corporaciones de 2009, el Certificado de Incorporación, los Estatutos ("By-laws") de la Asociación y resolvió que todos los dueños y arrendatarios de los predios de la Urb. Dorado del Mar Villas tenían derecho a ser miembros de la Asociación independientemente de si sus predios se segregaron de la finca 1951 o 1573. Dictaminó que, si bien las servidumbres en equidad solo gravaban la finca 1951, la falta de inscripción de la Escritura Núm. 60 sobre la finca 1573 no era razón para dejar sin efecto el lenguaje claro de los Estatutos ("By-laws") y la práctica aceptada desde que la Asociación comenzó a operar hasta la presentación de la Demanda. Ahora bien, **denegó la solicitud de Sentencia Declaratoria respecto a quiénes están obligados a pagar las cuotas para sufragar el control de acceso de Dorado del Mar porque la Asociación no presentó prueba que acreditara el cumplimiento con la Ley Núm. 21 de 20 de mayo de 1987, según enmendada, conocida como *Ley de Control de Acceso de 1987*, 23 LPRA sec. 64, et seq. ("Ley Núm. 21-1987") ni con las disposiciones transitorias del Art. 11 de la Ley Núm. 22 de 16 de julio de 1992 ("Ley Núm. 22-1992").** La Asociación

recurrió de dicha determinación; sin embargo, este Tribunal denegó el auto de *certiorari*.[4]

En Dorado del Mar Estates Homeowners Association Inc. v. David Carlos Álvarez González, et al., KLAN201001151[5] y en Dorado del Mar Estates Homeowners Association, Inc. v. Benigno Ayala Félix, et al., KLAN201100220,[6] otro panel del Tribunal de Apelaciones atendió una controversia similar relacionada a la membresía y capacidad de cobro de la Asociación e hizo expresiones conflictivas con la Sentencia que el panel hermano emitió en Dorado del Mar Estates Homeowners Association, Inc. v. Myrna Cordero, KLAN201000645. En ambos casos, tras evaluar el historial de la Asociación, la Escritura Núm. 60 y las disposiciones del Reglamento de la Asociación resolvió que esta no era la entidad legitimada por la Escritura Núm. 60 para cobrar cuotas de mantenimiento ni la entidad a la que todos los residentes de Dorado del Mar Estates estaban obligados a pertenecer porque no estaba compuesta exclusivamente por propietarios de Dorado del Mar Estates, conforme lo requería la Escritura Núm. 60. La Asociación recurrió de ambas Sentencias; sin embargo, denegamos ambos recursos.[7]

---

[4] Dorado del Mar Estates Homeowners Association Inc. v. Myrna Cordero, et al., CC-2010-1001 (auto de *certiorari* denegado).

[5] Dorado del Mar Estates Homeowners Association Inc. v. David Carlos Álvarez González, et al., KLAN201001151 (Sentencia de 23 de diciembre de 2010).

[6] Dorado del Mar Estates Homeowners Association, Inc. v. Benigno Ayala Félix, et al., KLAN201100220 (Sentencia de 21 de junio de 2011).

[7] Dorado del Mar Estates Homeowners Association Inc. v. David Carlos Álvarez González, et al., CC-2011-331 (auto de *certiorari* denegado) y

Tras estas decisiones, la Asociación procedió a formalizar el control de acceso de Dorado del Mar conforme a las disposiciones de la Ley Núm. 21-1987, *supra*. Tras evaluar la solicitud de la Asociación, el 20 de octubre de 2012 el Municipio de Dorado emitió la Ordenanza Municipal Núm. 18, Serie 2012-2013 ("Ordenanza Núm. 18-2012") en la que autorizó y ratificó el control de acceso de Dorado del Mar y dispuso que la operación y el mantenimiento del sistema estaría a cargo de la Asociación o su sucesora.[8] Ratificado el control de acceso, la Asociación optó por dar por perdidas las cuotas vencidas hasta ese momento; sin embargo, no renunció al cobro de las cuotas posteriores respecto a las personas que autorizaron el proceso de convalidación y ratificación del control de acceso.

Con este trasfondo en mente, pasemos a delinear los hechos que dieron génesis a la controversia de autos.

A.

El 19 de agosto de 2014 la Asociación presentó una Demanda de Cobro de Dinero contra Carlos Weber y Abigail Marrero Pérez ("los recurridos") al amparo de la Regla 60 de Procedimiento Civil de 2009, 32 LPRA Ap. V. Reclamó el pago de mil ciento veinticinco dólares ($1,125.00) por cuotas de mantenimiento presuntamente adeudadas. El 11 de septiembre de 2014 el foro primario convirtió el proceso a uno ordinario

---

Dorado del Mar Estates Homeowners Association, Inc. v. Benigno Ayala Félix, et al., CC-2011-623 (auto de *certiorari* denegado).

[8] Petición de *Certiorari,* Apéndice, págs. 109-112.

y le concedió a los recurridos treinta (30) días para contestar la Demanda.

Luego de varios trámites procesales, la Asociación presentó una Solicitud de Sentencia Sumaria. Arguyó que el control de acceso de Dorado del Mar se estableció y ratificó conforme a la Ley Núm. 21-1987, *supra*, y a la Ordenanza Municipal Núm. 18-2012. Además, la Legislatura Municipal de Dorado la certificó como entidad a cargo de administrar dicho control de acceso, por lo que podía cobrar las cuotas de mantenimiento en pugna. Añadió que los recurridos avalaron el sistema de control de acceso en virtud del cuestionario suscrito por la señora Marrero Pérez. Afirmó que, independientemente de las controversias pasadas relacionadas a la capacidad de cobro de la Asociación, el cumplimiento con la Ley Núm. 21-1987, *supra*, y la aprobación de la Ordenanza Núm. 18-2012 creó un nuevo estado de derecho.[9]

Los recurridos se opusieron a la Moción de Sentencia Sumaria. Sostuvieron que la Escritura Núm. 60 gravó la finca 1951 con unas condiciones restrictivas que afectaban a Dorado

---

[9] Recordemos que, por un lado, un panel del Tribunal de Apelaciones resolvió que para poder determinar quiénes estaban obligados a pagar cuotas de mantenimiento a la Asociación tenían que completar el proceso establecido por la Ley Núm. 21-1987 y por las disposiciones transitorias del Art. 11 de la Ley Núm. 22-1992. Por otro lado, otro panel del Tribunal de Apelaciones resolvió al menos en dos (2) ocasiones que la Asociación no tenía autoridad para cobrarle a los residentes de Dorado del Mar Estates las cuotas de mantenimiento porque no estaba compuesta exclusivamente por propietarios de Dorado del Mar Estates. Véase las Sentencias que el Tribunal de Apelaciones emitió el 15 de septiembre de 2010, el 23 de diciembre de 2010 y el 21 de julio de 2011 en *Dorado del Mar Estates Homeowners Association, Inc. v. Myrna* Cordero, *et al.*, KLAN201000645; Dorado del Mar Estates Homeowners Association, Inc. v. Álvarez González, et al., KLAN201001151; y, en *Dorado del Mar Estates Homeowners Association, Inc. v. Ayala Félix*, KLAN201100220, respectivamente.

del Mar Estates. Indicaron que la Escritura Núm. 60 requería que la Asociación estuviera compuesta exclusivamente por propietarios de Dorado del Mar Estates. Añadieron que la Ordenanza Núm. 18-2012 no podía menoscabar las servidumbres en equidad de la Escritura Núm. 60, por lo que la Asociación no tenía autoridad para cobrar las cuotas de mantenimiento en cuestión mientras no estuviera compuesta únicamente por residentes de Dorado del Mar Estates.

El 8 de julio de 2016 el foro primario dictó Sentencia y desestimó la Demanda. Afirmó que el control de acceso de Dorado del Mar tuvo su génesis en la Escritura Núm. 60, antes de que se aprobara la Ley Núm. 21-1987, *supra*. Sostuvo que la Escritura Núm. 60 instituyó unas servidumbres en equidad aplicables únicamente a Dorado del Mar Estates. Indicó que en virtud de la Escritura Núm. 60 los propietarios de Dorado del Mar Estates debían crear una entidad llamada Dorado del Mar Estates Homeowners Association para que velara por el cumplimiento de las servidumbres e, *inter alia*, estableciera un sistema de control de acceso para Dorado del Mar Estates. Añadió que la Escritura Núm. 60 especificaba que únicamente podían ser miembros de la Asociación los propietarios de Dorado del Mar Estates y que esta membresía era compulsoria. Enfatizó que los propietarios de Dorado del Mar Estates estaban obligados a pagar cuotas a la Asociación para el mantenimiento y seguridad de Dorado del Mar Estates, mas no para beneficio de otras urbanizaciones. Ahora bien, sostuvo que esta obligación era condicional a que la Asociación

estuviera compuesta exclusivamente por titulares de Dorado del Mar Estates. Así las cosas, adujo que los recurridos no estaban obligados a pagar las cuotas porque la Asociación estaba compuesta por titulares de varias urbanizaciones de Dorado del Mar. En fin, concluyó que ni la obtención del consentimiento de la mayoría de los titulares de todas las urbanizaciones que componen Dorado del Mar, conforme a la Ley Núm. 21-1987, *supra*, ni la Ordenanza Núm. 18-2012 podían dejar sin efecto las servidumbres en equidad.

Inconforme, la Asociación acudió al Tribunal de Apelaciones. Reconoció que la Escritura Núm. 60 sobre servidumbres en equidad únicamente se inscribió sobre la finca 1951. Admitió que la residencia de los recurridos estaba sita en un lote segregado de la finca 1951. Empero, arguyó que la Ley 21-1987, *supra*, según enmendada por la Ley Núm. 22-1992, *supra*, creó un nuevo estado de derecho que regía la controversia de epígrafe. Adujo que la Ordenanza Núm. 18-2012 no modificaba las condiciones restrictivas de la finca 1951 pues solo ratificaba el control de acceso que había operado en Dorado del Mar desde su inicio, con la particularidad de que aclaraba los derechos de las personas afectadas que no eran parte de la Asociación. Insistió en que los recurridos se obligaron a pagar la cuota de mantenimiento en virtud de la autorización que firmó la señora Marrero Pérez.

Los recurridos presentaron su Contestación al Escrito de Apelación. Se limitaron a argumentar que la autorización

firmada por la señora Marrero Pérez no los obligaba porque esta y su esposo conformaban una Sociedad de Gananciales y todo acto de administración sobre los inmuebles pertenecientes a dicha sociedad debía ser avalado por ambos. Su contención estuvo basada principalmente en *Residentes Sagrado Corazón v. Arsuaga*, 160 DPR 289 (2003).

El 28 de abril de 2017 el foro *a quo* emitió una Sentencia en la cual confirmó al foro primario. Coincidió con que los recurridos solo venían obligados a pagar las cuotas de mantenimiento a la Asociación siempre y cuando dicha entidad operara conforme a la Escritura Núm. 60. Concluyó que si bien la Orden Municipal Núm. 18-2012 era válida, las servidumbres en equidad de la Escritura Núm. 60 prevalecían respecto a los residentes de Dorado del Mar Estates.

Inconforme nuevamente, la peticionaria presentó ante este Tribunal el recurso de *certiorari* que nos ocupa y planteó la comisión de los errores siguientes:

1. Erró el Honorable Tribunal de Apelaciones al ignorar el mandato de la sentencia anterior del propio tribunal que ordena la admisión de todos los residentes de urbanizaciones colindantes que así lo deseen a formar parte de la Dorado del Mar Estates Homeowners Association, Inc., al ignorar la autorización de la Asamblea Municipal de Dorado a que sea esta entidad la que opere y cobre cuotas a los residentes de las urbanizaciones afectadas, incluyendo aquella en donde el control es mandatorio, y de esa forma condenar a la inoperancia el sistema instaurado hace décadas y ratificado conforme la nueva legislación.

2. Erró el Honorable Tribunal de Apelaciones al concluir que el cuestionario firmado por la demandada Marrero para autorizar el control de acceso "no es suficiente para obligar a los esposos Weber-Marrero al pago de los gastos del mantenimiento del control de acceso". Se trata de

un asunto de hechos que nunca fue planteado ante el TPI ni fue considerado por dicho foro. Tampoco formó parte de la sentencia de Instancia, donde ni siquiera se menciona. La parte demandada recurrida levantó por primera vez ese asunto al contestar el escrito de apelación.

Atendido el recurso, el 1 de diciembre de 2017 expedimos el auto solicitado. Contando con el beneficio de los alegatos de ambas partes, nos encontramos en posición de resolver.

II.

A.

Las servidumbres en equidad, también denominadas condiciones restrictivas o restricciones voluntarias, son limitaciones al derecho de propiedad. De ordinario, el urbanizador de una finca las constituye unilateralmente sobre esta para restringir las facultades de todo futuro adquirente respecto al inmueble gravado. Estas imponen restricciones, condiciones y limitaciones respecto al *uso y a las edificaciones permisibles* con el fin primordial de 'preservar la belleza, la comodidad y la seguridad del reparto residencial'. *Rodríguez, et al. v. Gómez,* 156 DPR 307, 312 (2002); *Asoc. V. Villa Caparra v. Iglesia Católica*, 117 DPR 346, 351 (1986) (citando a *Sands v. Ext. Sagrado Corazón, Inc.*, 103 DPR 826, 827 (1975)) (Énfasis suplido); *Colón v. San Patricio Corporation*, 81 DPR 242, 250 (1959). Se trata de "cláusulas restrictivas 'a beneficio de los presentes y futuros adquirentes' que imponen cargas o gravámenes especiales, como parte de un plan general de mejoras para el desarrollo de una urbanización residencial…". *Asoc. Vec. Urb. Huyke v. Bco. Santander*, 157

DPR 521, 534-535 (2002) citando a *Colón v. San Patricio Corporation*, supra, pág. 250. Las servidumbres en equidad se utilizan frecuentemente para conservar la configuración arquitectónica o urbanística de un proyecto dentro de parámetros determinados. M.J. Godreau y A.I. García Saúl, *Servidumbres y Conservación*, 67 (Núm. 2) Rev. Jur. U.P.R. 249, 301 (1998). Esto se logra limitando las facultades de todo futuro adquirente respecto a: la edificación de obras nuevas; los cambios que pueden hacer en las obras ya hechas; y, los usos a los que puede destinarse una propiedad. *Residentes Parkville v. Díaz*, 159 DPR 374, 384 (2003).

Esta figura jurídica de origen angloamericano se incorporó a nuestro ordenamiento hace más de un siglo en *Glines, et al. v. Matta, et al.*, 19 DPR 409 (1913). Para efectos jurídicos, las servidumbres en equidad se consideran un contrato entre las partes. *Residentes Parkville v. Díaz*, supra, pág. 384. Ello, debido a que las partes interesadas pueden convenir gravar sus propiedades para delimitar su uso. Asimismo, quien adquiere una propiedad ya gravada con condiciones restrictivas acepta someterse a ellas. Véanse: *Íd.*; *Asoc. Vec. Urb. Huyke v. Bco. Santander*, 157 DPR 521 (2002); *Rodríguez et al. v. Gómez et al.*, supra. Mientras no sean modificadas o extinguidas, las servidumbres en equidad debidamente constituidas instituyen derechos reales que deben respetarse. El dueño de un predio que desee hacer valer o impedir la violación de las condiciones restrictivas que lo gravan tiene a su disposición el injunction. *Asoc. v.*

*Villa Caparra v. Iglesia Católica*, supra, págs. 353-354; *Colón v. San Patricio*, supra, pág. 254.

Las servidumbres en equidad pueden modificarse o extinguirse de varias formas. Hemos reiterado que pueden modificarse o extinguirse: (1) por acuerdo de los interesados, ya sea mediante rescisión total o parcial o mediante la constitución de nuevas restricciones que alteren las anteriores; (2) por el transcurso del tiempo o por realizarse la condición, si las restricciones se constituyeron a plazo o condicionalmente; (3) por confusión, si se reúne en una misma persona la propiedad de todos los predios sirvientes y dominantes; (4) por renuncia o abandono de los propietarios que se benefician de la servidumbre, mediante conducta que demuestre la intención concluyente de renunciar o abandonarla; (5) por expropiación forzosa del predio sirviente, si las condiciones restrictivas son incompatibles con el uso público del inmueble expropiado; y (6) cuando cambios radicales del vecindario no solo hacen la restricción irrazonable y opresiva para el dueño del predio sirviente, sino también destruyen el valor que la restricción tenía para el dueño del predio dominante, por lo cual resulta imposible alcanzar los fines que perseguía la servidumbre. *Colón v. San Patricio Corporation*, supra, págs. 261-262; *Asoc. V. Villa Caparra v. Iglesia Católica*, supra, pág. 354; *Asoc. Vec. Urb. Huyke v. Bco. Santander*, supra, pág. 537.

B.

Las corporaciones privadas son personas jurídicas que existen por virtud de ley. Art. 27 del Código Civil de Puerto Rico, 31 LPRA sec. 101. Dependiendo de la naturaleza de la corporación, estas se rigen por las leyes aplicables, por las cláusulas de incorporación y por sus reglamentos. Art. 28 del Código Civil de Puerto Rico, 31 LPRA sec. 102. De ordinario, la Ley General de Corporaciones es la ley especial a tenor de la cual deben dilucidarse las interrogantes relacionadas a la existencia y a la vida jurídica de las corporaciones privadas. Véase: *D.A.Co. v. Alturas Fl. Dev. Corp. y otro*, 132 DPR 905, 915 (1993).

En términos de su propósito general, las corporaciones pueden catalogarse como entidades con fines de lucro o sin fines de lucro. Por un lado, las Corporaciones con Fines de Lucro son aquellas en las que sus dueños se benefician económicamente de la gesta corporativa a través de la acumulación de capital y la repartición de ganancias. Por otro lado, las Corporaciones sin Fines de Lucro son aquellas que utilizan los beneficios o las ganancias de su gestión para promover la misión y los fines sociales de la entidad, mas no para beneficiar económicamente a sus miembros ni a terceros. Véase, C. Díaz Olivo, *Sin Fines de Lucro: Normativa Jurídica del Tercer Sector*, Colombia (2016), pág. 11-13. El proceso para incorporar una organización sin fines de lucro es similar al que hay que completar para incorporar una entidad con fines de lucro. *Íd.*, pág. 82.

Una corporación existe *de jure* cuando se otorga, se radica y se registra el Certificado de Incorporación, en cumplimiento con todos los elementos requeridos por ley. Otorgado y radicado el Certificado de Incorporación, la entidad corporativa se constituye "**con el nombre que aparezca en el certificado**". Véase: Art. 1.05 de la Ley Núm. 164 de 16 de diciembre de 2009, según enmendada, conocida como Ley General de Corporaciones de 2009, 14 LPRA sec. 3505 (ed. 2011) (Énfasis suplido); Art. 1.06 de la Ley Núm. 144 de 10 de agosto de 1995, según enmendada, conocida como Ley General de Corporaciones de 1995, 14 LPRA sec. 2606 (ed. 2008) (Énfasis suplido); Art. 106 de la Ley Núm. 3 de 9 de enero de 1956, según enmendada, conocida como Ley General de Corporaciones de 1956, LPR (Quinta a Octava Sesiones Especiales) (1955) (Énfasis suplido)("Ley Núm. 3-1956"). Véase además, C. Díaz Olivo, *Corporaciones: Tratado sobre Derecho Corporativo*, Colombia, 2016, pág. 108. (Énfasis suplido); 1A *Fletcher Cyc. Corp.* Secs. 135 y 166, págs. 213, 283-284 (Perm ed. 2010). Sobre este particular, el Profesor Díaz Olivo opina que "[s]in la otorgación, la radicación y el registro de un certificado de incorporación, no existe personalidad [jurídica] **ni hay en definitiva una corporación**". Véase: C. Díaz Olivo, *Corporaciones: Tratado sobre Derecho Corporativo, op. cit.*, pág. 19. (Énfasis suplido). Hasta el año 1995, y entre los años 1999 y 2009, una corporación podía existir *de facto* aunque no se hubieran cumplido todos los requisitos en ley para su registración;

sin embargo, se requería que -**como mínimo**- se hubiera otorgado y radicado el Certificado de Incorporación correspondiente. *Cordero v. Supermercado San Juan, Inc.*, 103 DPR 783, 786 (1975).[10]

Las distintas Leyes Generales de Corporaciones que han regido en Puerto Rico han requerido que determinados asuntos se consignen expresamente en el Certificado de Incorporación a radicarse ante el Departamento de Estado. Como norma general, las condiciones o requisitos que deben reunir los miembros de las Corporaciones Sin Fines de Lucro es uno de los asuntos que deben consignarse en el Certificado de Incorporación. Por excepción, los incorporadores pueden estipular en el Certificado de Incorporación que las condiciones o requisitos para ser miembro de la Corporación Sin Fines de Lucro a incorporarse se establecerán en los Estatutos ("By-laws") de la corporación.

A la fecha en la que se otorgó la Escritura Núm. 60 estaba en vigor la Ley General de Corporaciones de 1956.[11] Uno de los asuntos que obligatoriamente debía contener todo Certificado de Incorporación de una Corporación Sin Fines de Lucro constituida bajo dicha Ley eran las condiciones requeridas para los socios de este tipo de entidad. Específicamente, el Art. 102(a)(4) de la Ley Núm. 3-1956

---

[10] Para un análisis sobre la adopción y erradicación de la doctrina de incorporación de facto véase, C. Díaz Olivo, *Corporaciones: Tratado sobre Derecho Corporativo*, Colombia, 2016, págs. 109-115.

[11] Ley Núm. 3-1956 (1955 (Quinta a Octava Sesiones Especiales) Leyes de Puerto Rico).

disponía que: "[l]as condiciones requeridas de los socios de [las corporaciones sin fines de lucro] se consignarán asimismo en el certificado de incorporación, o podrá estipularse en éste que dichas condiciones habrán de figurar en los estatutos de la corporación". Véase, Ley 3-1956 (1955 (Quinta a Octava Sesiones Especiales) Leyes de Puerto Rico 105). A pesar de que se adoptó una nueva Ley General de Corporaciones en 1995 y otra en el 2009, el marco jurídico en cuanto a este particular permaneció intacto.[12] Véanse los Arts. 1.02(a)(4) y 19.05 de la Ley General de Corporaciones de 1995, 14 LPRA secs. 2602(a)(4) y 3421(d) (ed. 2008) y el Art. 1.02(A)(4)(d) de la Ley General de Corporaciones de 2009, 14 LPRA sec. 3502(A)(4)(d) (ed. 2011). En fin, desde la aprobación de la Ley Núm. 3-1956 se ha requerido que las condiciones o requisitos para ser miembro de una Corporación Sin Fines de Lucro se consignen en el Certificado de Incorporación o, en la alternativa, en los Estatutos Corporativos.

Los Certificados de Incorporación de las corporaciones sin acciones de capital pueden enmendarse. Ello, *inter alia*, para cambiar el nombre y el propósito de la entidad. Para

---

[12] Cabe destacar que la Ley General de Corporaciones de 1956 regulaba tanto a las Corporaciones Con Fines Pecuniarios como a las Corporaciones Sin Fines de Lucro. A diferencia de la Ley General de Corporaciones de 1956, la Ley General de Corporaciones de 1995 incluyó un capítulo dedicado solo a las Corporaciones Sin Fines de Lucro. Al aprobarse la Ley General de Corporaciones de 2009, se eliminó el capítulo que regulaba las Corporaciones Sin Fines de Lucro y se optó por volver a la estructura original de la Ley de 1956 que aplicaba por igual tanto a las Corporaciones Sin Fines de Lucro como a las Corporaciones Con Fines Pecuniarios. Para un trasfondo de las leyes que han regido a las Corporaciones Sin Fines de Lucro véase C. Díaz Olivo, *Sin Fines de Lucro: Normativa Jurídica del Tercer Sector*, Colombia (2016), págs. 74-80.

enmendar su Certificado de Incorporación, los miembros del organismo directivo de la corporación sin fines de lucro deben aprobar una Resolución en la que se consigne la enmienda propuesta y se declare su conveniencia. La enmienda al Certificado de Incorporación debe ser aprobada por una mayoría de todos los miembros del organismo directivo de la entidad. Aprobada la enmienda, debe otorgarse, autenticarse y radicarse el certificado correspondiente. Véanse: Art. 8.02 de la Ley General de Corporaciones de 2009, 14 LPRA sec. 3682(a), (b)(3) (ed. 2011); Art. 8.02 de la Ley General de Corporaciones de 1995, 14 LPRA sec. 2952(a), (b)(3) (ed. 2008). Como norma general, la naturaleza e identidad de una corporación no se destruye por el mero cambio de su nombre corporativo. 6 *Fletcher Cyc. Corp. Sec.* 2456.

C.

La Asamblea Legislativa aprobó la Ley Núm. 21-1987, *supra*, con el propósito de proveerle a la ciudadanía un arma con la cual pudieran cooperar en la lucha contra el crimen. Exposición de Motivos de la Ley Núm. 21 de 20 de mayo de 1987 (1987 Leyes de Puerto Rico 67); *Alonso Piñero v. UNDARE, Inc.*, 2017 TSPR 171. Específicamente, y reconociendo que la participación comunitaria es medular para atajar la criminalidad en la Isla, autorizó a las comunidades a establecer mecanismos para controlar el acceso vehicular, limitar el uso público de las calles y, de esta forma, aliviar la carga de la Policía de Puerto Rico. *Íd.*

Para viabilizar su propósito, la Ley Núm. 21-1987, *supra*, facultó a los municipios a conceder permisos para el establecimiento de sistemas de control de acceso y estableció las normas y procedimientos generales a seguir en la obtención de dichos permisos. 23 LPRA sec. 64 (ed. 2011). Así, quien solicite autorización para instaurar un sistema de control de acceso en su calle, comunidad o urbanización debe asegurarse de que se cumplen, *inter alia*, los siguientes requisitos: (1) que la calle, comunidad o urbanización tenga un consejo, junta o asociación de residentes debidamente incorporada en el Departamento de Estado como organización sin fines de lucro; (2) que en la comunidad a cerrar con un control de acceso no exista ningún edificio o estructura propiedad del Gobierno de Puerto Rico o de los municipios que sea para el uso y disfrute público, salvo escuelas, parques o centros comunales; (3) que la solicitud de autorización para controlar el acceso de la calle, comunidad o urbanización haya sido adoptada por al menos tres cuartas (3/4) partes de los propietarios de las residencias allí sitas, limitándose la participación de los propietarios a uno por vivienda y haciéndose constar por escrito bajo la firma de ambos cónyuges; y, (4) que la comunidad a cerrar se comprometa y garantice que asumirá los gastos de instalación, operación y mantenimiento de las facilidades del control de acceso. 23 LPRA sec. 64a; *Alonso Piñero v. UNDARE, Inc.*, supra.

Asimismo, la Ley Núm. 21-1987, *supra*, faculta a los miembros de una comunidad a organizarse en un Consejo, Asociación o Junta de Residentes para que sean estos quienes, *inter alia*: (1) soliciten la autorización correspondiente al municipio; (2) impongan y cobren la cuota necesaria para cubrir los costos y gastos de instalación, operación y mantenimiento del control de acceso y (3) de ser necesario, reclamen el pago por la vía judicial. *Íd.*, pág. 4; 23 LPRA secs. 64a y 64d-3 (ed. 2011). En lo pertinente, la Ley Núm. 21-1987, *supra*, define este cuerpo directivo como aquel

> **[o]rganismo debidamente incorporado en el Departamento de Estado como organización sin fines de lucro** creado para velar por los intereses de la comunidad el cual se rige por una Junta de Directores, oficiales electos, reglamento interno y sistema de recolección de cuotas. Incluye el término Consejo de titulares, según definido en la [Ley de Condominios]. 23 LPRA sec. 64(d)(ed. 2011)(Supl. 2018)(Énfasis suplido).[13]

Ahora bien, ¿qué ocurrió con aquellas comunidades y urbanizaciones cuyo sistema de control de acceso fue instalado antes que se aprobara la Ley Núm. 21-1987, *supra*? La Asamblea Legislativa aprobó la Ley Núm. 22-1992, *supra*, para enmendar varias secciones de la Ley Núm. 21-1987, *supra*, e instituyó un proceso especial de ratificación para urbanizaciones o comunidades cuyos propietarios compraron

---

[13] El 5 de enero de 1989 se aprobó el Reglamento de Planificación Núm. 20, conocido como el Reglamento de Control de Tránsito y Uso Público de Calles Locales, para establecer las normas y el procedimiento necesario para que los municipios pudieran autorizar los mecanismos de control de acceso en las urbanizaciones y comunidades que lo solicitaran. La Sección 2.06 del mencionado Reglamento define el "Consejo de Residentes" como "[o]rganismo debidamente incorporado en el Departamento de Estado como organización sin fines de lucro… Es sinónimo de Junta o Asociación de Residentes". (Subrayado nuestro).

inmuebles antes de la aprobación de la Ley Núm. 21-1987,
*supra*, bajo la creencia de que el desarrollador había
obtenido autorización para establecer un sistema de control
de acceso. En cuanto a este particular, el Artículo 11 de la
Ley Núm. 22-1992, *supra*, dispuso que en tales casos los
municipios podrán conceder el permiso correspondiente -sin
necesidad de cumplir con el proceso ordinario establecido en
la Sección 64b de la Ley Núm. 21-1987, *supra*- siempre y
cuando

> (1) El urbanizador o desarrollador de terrenos o
> constructor de una urbanización, lotificación o
> lotificación simple, sus agentes o empleados o el
> vendedor de los mismos, cualquiera que fuere,
> exhibió, ofreció, promovió o anunció la venta de
> las viviendas, solares, lotes o terrenos
> induciendo a creer que la calle, urbanización o
> comunidad estaba debidamente autorizada de acuerdo
> a esta ley para establecer, mantener y operar
> controles de acceso;

> (2) la Asociación de Residentes demuestre al
> municipio que es la legítima representante de los
> propietarios de la calle, urbanización o comunidad
> de que se trata y que la solicitud para formalizar
> y convalidar el control de acceso fue adoptada por
> lo menos por tres cuartas (3/4) partes de los
> propietarios; [y]

> (3) la Asociación de Residentes presente al
> municipio evidencia de que las obras e instalación
> de los dispositivos de control de acceso estaban
> instaladas y operando antes del 20 de mayo de 1987.

Los consejos, las juntas o las asociaciones de
residentes son los entes facultados para imponer cuotas
destinadas a sufragar los costos de instalación, operación
y mantenimiento del sistema de control de acceso, así como
los salarios del personal contratado para operar el mismo.
23 LPRA sec. 64d-3(a) (Supl. 2018). Asimismo, tienen

legitimación para cobrar dicha cuota y reclamar la deuda judicialmente a los propietarios. *Íd.* La obligación de satisfacer las cuotas antes mencionadas recae en

> (1) Los propietarios de fincas en las que se haya inscrito la autorización o permiso bajo el procedimiento establecido en la sec. 64d-1 de este título.
>
> (2) Los propietarios que autorizaron la solicitud para establecer el control de acceso, según fue implantado.
>
> (3) Todo propietario adquirente de una finca, ubicada en una urbanización, calle o comunidad que ha sido autorizada por el municipio correspondiente para controlar el acceso o que, a la fecha de la compraventa, se encontrara en trámite de obtener el consentimiento de tres cuartas (3/4) partes de los propietarios y así conste en actas…
>
> (4) Cuando la solicitud fue hecha por el urbanizador, desarrollador o constructor, el pago de cuota será obligatorio para toda persona que advenga dueño del inmueble.
>
> (5) Los propietarios que no autorizaron expresamente el establecimiento del sistema de control de acceso, pero que en fecha posterior se comprometieron al pago mediante contrato escrito.

Por su parte, los propietarios que no hayan autorizado expresamente el establecimiento del sistema de control de acceso no tienen la obligación de pagar las cuotas para el establecimiento, operación, mantenimiento o remoción de dicho sistema, a menos que posteriormente se comprometan a satisfacerlas mediante contrato escrito. 23 LPRA sec. 64g.

### III

#### A.

Primeramente, disponemos del segundo señalamiento de error. La Asociación aduce que el Tribunal de Apelaciones

erró al resolver que el cuestionario que la señora Marrero Pérez firmó para autorizar la convalidación del control de acceso era insuficiente para obligar a los recurridos al pago de las cuotas de mantenimiento. Sostiene que los recurridos argumentaron este asunto por primera vez al contestar la Apelación. Tiene razón.

La Asociación trajo a colación el cuestionario firmado por la señora Marrero Pérez en varias ocasiones durante el pleito; sin embargo, de los autos surge que los recurridos lo impugnaron **-por primera vez-** ante el Tribunal de Apelaciones en su Contestación al Escrito de Apelación. Es norma trillada y de harto conocimiento que un tribunal apelativo no debe considerar cuestiones que no fueron planteadas por las partes ni consideradas por el tribunal inferior. Véanse, por ejemplo: *E.L.A. v. Northwestern Selecta*, 185 DPR 40, 55 (2012); *Abengoa, S.A. v. American Intl. Ins.*, 176 DPR 512, 526 (2009); *Echandi Otero v. Stewart Title*, 174 DPR 355, 383, n.15 (2008); *Trabal Morales v. Ruiz Rodríguez*, 125 DPR 340, 351 (1990); *Santiago Cruz v. Hernández Andino*, 91 DPR 709, 712 (1965). Por lo tanto, erró el Tribunal de Apelaciones al considerar el planteamiento sobre la suficiencia del cuestionario que firmó la señora Marrero Pérez, en lugar de darlo por renunciado.[14]

---

[14] Los recurridos no impugnaron la suficiencia del cuestionario suscrito por la señora Marrero Pérez ni en la Vista Inicial, ni en la Contestación a Demanda, ni en el escrito intitulado Fundamentos a la Contestación a la Demanda, ni en la Oposición a Moción de Sentencia Sumaria. Destacamos que, según surge de los autos, los recurridos impugnaron la suficiencia del cuestionario -por primera vez- en el Escrito en Contestación a Apelación que presentaron ante el Tribunal de Apelaciones.

B.

El primer señalamiento de error nos obliga a auscultar ¿quiénes pueden ser miembros de la Asociación? Luego de contestar esta interrogante, podrá determinarse quiénes pueden ratificar el sistema de control de acceso de Dorado del Mar al amparo de la Ley Núm. 21-1987, *supra*, y, consecuentemente, quiénes están obligados a pagar las cuotas para la operación y el mantenimiento del sistema.

i.

La Asociación reconoce que la Escritura Núm. 60 grava la finca en la que se desarrolló Dorado del Mar Estates. Sin embargo, entiende que, al ratificar el sistema de control de acceso, y conforme a la Ordenanza Núm. 12-2012, pueden cobrar las cuotas de mantenimiento en cuestión. Cabe destacar que la Asociación no controvierte la validez ni la vigencia de las servidumbres en equidad instituidas por la Escritura Núm. 60. *A contrario sensu*, tanto en la Petición de *Certiorari* como en su Alegato admite que la validez de estas condiciones restrictivas está incontrovertida.

Por su parte, los recurridos arguyen que la Escritura Núm. 60 dispone que quienes único pueden ser miembros de la Asociación son los propietarios de Dorado del Mar Estates, para quienes la membresía es compulsoria. Como corolario, arguyen que mientras la Asociación no tenga la composición requerida en la Escritura Núm. 60 no tienen facultad para cobrar las cuotas de mantenimiento en cuestión. No les asiste la razón. Veamos.

La Escritura Núm. 60 intitulada *Deed of Restrictive Covenants* estableció unas servidumbres en equidad sobre la finca 1951 de Dorado en la que se desarrolló Dorado del Mar Estates.[15] Respecto a este particular, citamos *in extenso* el tercer párrafo expositivo de la Escritura Núm. 60, el cual dispone que

> The restrictive covenants herein established upon the lots referred to in the Second paragraph of this deed shall be the following:
>
> a) No lot shall be used except for residential purposes.
> b) No building shall be located on any lot nearer to the front line or nearer to the side street line than the minimum building setback shown on the recorded plot. In any event, no single family residences shall be located on any lot nearer than fourteen (14) feet to the front street line or nearer than ten (10) feet to any side street line.
> c) No dwelling shall be located nearer than ten (10) feet and six (6) inches from one of its side lot lines, nor nearer than six (6) feet and six (6) inches from its opposite side lot line or nearer than fifteen (15) feet to the rear lot line. Any unintentional deviation from the above building line restrictions not in excess of six (6) inches shall not be construed as a violation of these covenants. For the purpose of these covenants, eaves, carports, steps and open porches shall not be considered as a part of a building, provided, however, that this shall not be construed to permit any portion of a building on a lot to encroach upon another lot.
> d) Easements for installation and maintenance of utilities and drainage facilities are reserved as shown on the recorded plot.

---

[15] Según el lenguaje de la propia Escritura Núm. 60, las **restricciones de uso y limitaciones de construcción** aplican a los lotes siguientes: en el Bloque A, los lotes 1 al 21; en el Bloque B, los lotes 1 al 4 y desde el 14 al 16; en el Bloque AA los lotes 1 al 40 y en el Bloque BB, los lotes 1 al 10; en el Bloque CC, los lotes 1 al 10; en el Bloque DD, los lotes 1 al 8; en el Bloque EE, los lotes 1 al 8; en el Bloque FF los lotes 1 al 11; en el Bloque GG, los lotes 1 al 6; en el Bloque HH, los lotes 1 al 11; en el Bloque II, los lotes 1 al 10; en el Bloque JJ, los lotes 1 al 47; en el Bloque LL, los lotes 1 al 30; en el Bloque MM, los lotes 1 al 14; Bloque NN, los lotes 1 al 8; en el Bloque OO, los lotes 1 al 6 y finalmente en el Bloque PP, los lotes del 1 al 16.

e) No noxious or offensive activity shall be carried on upon any lot, nor shall anything be done thereon which may be or may become an annoyance or nuisance to the neighborhood.

f) No structure of a temporary character such as trailer, basement, tent, shack, barn, garage or other out building shall be used on any lot at any time as residence either temporarily or permanently.

g) No sign of any kind shall be displayed to the public view on any lot except one of not more than one square foot advertising the property for sale or rent.

h) No animals, livestock, or poultry of any kind shall be raised, bred or kept on any lot, except that dogs, cats and other households pets may be kept provided they are not kept, bred or maintained for any commercial purposes and provided they are kept in such a way that they shall not become public or private nuisances.

i) The owner of the lot shall comply with all sanitary regulations of the Planning Board of Puerto Rico, or any Governmental agency with power to regulate construction.

j) No building shall be placed, nor shall any material, or refuse be placed or stored on any lots within fourteen (14) feet of the property line of any park or edge of any open water course, except that clean fill may be placed nearer provided that the natural water course is not altered or blocked by such fill. No grading or shaping of any lots shall be permitted that would change or retard the flow of excess surface water.

k) No lot shall be used or maintained as a dumping ground for rubbish. Trash, garbage or other waste shall not be kept except in sanitary containers. All incinerators or other equipment for the storage or disposal of such material shall be kept in a clean and sanitary condition.

l) The residential units are designed for one story construction. Additional story heights will not be added. No television antennas or of any other kinds shall be installed in any part of the residential units.

m) No changes shall be made by any lot grading that would in any manner affect drainage or slope control except by the approval of revised grading as prepared by a registered engineer and approved by the Planning Board of Puerto Rico.

n) The lot coverage of the living area of a single family residential unit will not exceed thirty five (35) per cent of the total area.

o) That garages, maid quarters, utility rooms, or any other accessory buildings shall not be built, nor

permitted to remain abutting the street lot lines. A minimum setback of ten feet (10') from said lot lines shall be required and a minimum distance of six feet (6') between main building and accessory building is required.

p) No walls, fences, hedges or other boundary divisions, besides those provided by the appearing party, shall be erected or placed on or near the boundaries of the lot. However, fences or hedges may be allowed along the boundary lines from the intersections of the existing fences toward the back of the lot and along the back boundary of the lot, provided the same have been approved in writing by the Board of Directors of the Dorado del Mar Estates Homeowners Association, Inc., referred to in paragraph (t). The owner of the lot will not permit any such fences or hedges so approved to become unsightly or overgrown by weeds.

q) Residential units are restricted to one story single family detached structures.

r) Proposed accessory structures, alterations or additions to any house shall be submitted to the Board of Directors of Dorado del Mar Estates Homeowners Associations, Inc. which will approve in writing such proposed constructions provided the same do not change the architectural concept of the house and the development, and are esthetically within the character and style of the development.

s) No dwelling shall be kept without proper maintenance of its exteriors including, among others, paint of structures (house walls, fences, etc.) and upkeeping of grounds and gardening. The dwellings may be painted white only on the exterior.

t) **Every owner of a lot in Dorado del Mar Estates shall be bound to maintain his membership in the Dorado del Mar Estates Homeowners Association, Inc., <u>a non profit corporation organized</u> for the purposes of enforcing the restrictive covenants hereinbefore set forth, for the maintenance of the public areas of the development and the regulation of the use thereof and for the establishment of a security system therefor. Membership in said corporation shall be open only to such persons that have recorded title in the Registry of Property or recordable and pending recordation, upon lots in the Dorado del Mar Estates.**
The breach of any of the restrictive covenants hereinbefore set forth shall entitle Dorado del Mar Estates Homeowners Associations, Inc. to take the necessary steps to cure said breach, charging the cost thereof to the delinquent owner. If said

breach were sufficiently material, in the judgement of the Board of Directors, said corporation shall have the right to reacquire the property upon payment of its market value, as determined by the Board of Directors, in cash, less the outstanding balances of any mortgages constituted upon the same and any property taxes due. Should the owner affected disagree with the appraisal made by the Board of Directors, the controversy shall be adjudicated by arbitration pursuant to the provisions of Act number three hundred seventy six (376) of May eight, nineteen fifty one, as amended, thirty two (32) LPRA, Sections three thousand two hundred one (3201) et seq. Nothing herein contained shall preclude Dorado del Mar Estates Homeowners Associations, Inc. from seeking such other remedies at law or equity it may have as consequence of the breach of any of the restrictive covenants herein enumerated.

If the owner should fall to maintain his membership in the Dorado del Mar Estates Homeowners Association, Inc. said corporation shall have the right to reacquire his property in the same manner hereinbefore set forth.

The Board of directors of Dorado del Mar Estates Homeowners Association, Inc. shall be elected initially by its incorporators, for the term of one year, and subsequently, by the members of the corporation in meetings held in accordance with its By-Laws.

u) The invalidation of any of the above covenants by judgments or court order shall in no way affect any of the other provisions which shall remain in full force and effect.

v) These covenants are to run with the land and shall be binding on all parties and all persons claiming under them for a period of twenty five (25) years from the date these covenants are recorded, after which time said covenants shall be automatically extended for successive periods of ten years, unless an instrument signed by a majority of the then owners of the lots has been recorded, agreeing to change said covenants in whole or in part. Petición de *Certiorari*, Apéndice, págs. 96-102 (Énfasis nuestro).

Como hemos reiterado, los recurridos arguyen que la Asociación no puede cobrar las cuotas de mantenimiento para el sostenimiento del control de acceso que administra mientras su composición no se ajuste a las disposiciones de

la Escritura Núm. 60. Estos cimentan sus argumentos en la premisa inarticulada de que la membresía de la Asociación es una servidumbre en equidad que grava la finca 1951 por virtud de la Escritura Núm. 60. Sin embargo, el requisito de membresía dispuesto en la Cláusula (t) del tercer párrafo expositivo de la Escritura Núm. 60 no vincula a la Asociación por varias razones.

**Primero**, al otorgarse la Escritura Núm. 60, Dorado del Mar Estates Homeowners Association, Inc. no existía *de jure* ni *de facto.* La Escritura Núm. 60 fue otorgada el 23 de noviembre de 1971. En lo pertinente, esta dispone que todos los propietarios de Dorado del Mar Estates deben ser miembros de la Asociación, **"a non profit corporation <u>organized</u> for the purposes of enforcing the restrictive covenants,…,** for the maintenance of the public areas of the development and the regulation of the use thereof and for the establishment of a security system therefor[,]" denominada Dorado del Mar Estates Homeowners Association, Inc.[16] Evidentemente, la Cláusula (t) del tercer párrafo expositivo de la Escritura Núm. 60 presupone la existencia de Dorado del Mar Estates Homeowners Association, Inc. Sin embargo, del Registro de Corporaciones del Departamento de Estado no surge que al 23 de noviembre de 1971 existiera una Corporación sin Fines de Lucro incorporada bajo el nombre de Dorado del Mar Estates Homeowners Association, Inc. Es decir, no surge que se

---

[16] Petición de *Certiorari*, Apéndice, págs. 99-100. (Énfasis suplido).

hubiera otorgado, radicado y registrado un Certificado de Incorporación para inscribir la Asociación bajo dicho nombre corporativo. Por lo tanto, la corporación prevista en la Cláusula (t) del tercer párrafo expositivo de la Escritura Núm. 60 no existía *de jure* ni había base para asumir que existía *de facto*. Como cuestión de hecho, el Certificado de Incorporación de la Asociación se otorgó y radicó el 1 de septiembre de 1976 bajo otro nombre, a saber: Dorado del Mar Homeowners Association, Inc.[17] Por lo tanto, fue bajo ese nombre corporativo que la Asociación se constituyó y nació a la vida jurídica. No fue hasta el 14 de mayo de 2007 que la Asociación cambió su nombre corporativo de Dorado del Mar Homeowners Association, Inc. a Dorado del Mar Estates Homeowners Association Inc.[18] En fin, la Asociación no es la entidad prevista en la Escritura Núm. 60, por lo que el requisito de membresía allí dispuesto le es inaplicable.

---

[17] El Certificado de Incorporación de la Asociación establecía que el propósito de la entidad sería

> [t]o promote harmonious relationship within the community, protect and Maintain the well being of the members, the beautifications and maintenance of the community, architectural control as the preservation of the existing Spanish motiff and the implementation of the established convenience as set forth in Article of the by-laws.

Por otro lado, los Estatutos Corporativos de la Asociación indicaban que el propósito de dicha entidad sería similar al establecido en el Certificado de Incorporación. Sin embargo, aclaraban que la Asociación implementaría las condiciones restrictivas establecidas en el Artículo VIII de los Estatutos.

[18] Véase, *Certificado de Enmienda del Certificado de Incorporación de Dorado del Mar Homeowners Association, Inc. una Corporación Sin Fines de Lucro y Sin Acciones de Capital* y la Certificación correspondiente del Departamento de Estado. Petición de *Certiorari*, Apéndice, págs. 136-138. La Asociación enmendó el párrafo relacionado a su propósito para especificar que tenía el fin de administrar las condiciones restrictivas impuestas en la Escritura Núm. 60.

**Segundo**, las condiciones para ser miembro de la Asociación son aquellas dispuestas en su Certificado de Incorporación, según enmendado. Cabe resaltar que tanto la Ley Núm. 21-1987, *supra*, como el Reglamento de Planificación Núm. 20 definen "Consejo, Asociación o Junta de Residentes" como "organismo debidamente incorporado en el Departamento de Estado como organización sin fines de lucro…". Véase: 23 LPRA sec. 64(d) (Supl. 2018); Sección 2.06 del Reglamento de Planificación Núm. 20. Es decir, las Asociaciones de Residentes tienen que estar debidamente incorporadas como Corporaciones sin Fines de Lucro.[19] Por tratarse de una corporación, todo lo relativo a su incorporación y a las condiciones que deben reunir sus miembros se rige en primer

---

[19] Reconocemos que en su obra intitulada *Derecho de urbanizaciones: servidumbres en equidad, controles de acceso e instalaciones vecinales*, la Profesora Margarita García Cárdenas opina que la Asociación de Residentes y las Servidumbres en Equidad podrían constituirse en una sola Escritura Pública debido a que no existe una ley que regule la relación entre las condiciones restrictivas y las asociaciones de residentes. Sin embargo, considerando el derecho vigente, no podemos coincidir con tal planteamiento. Tanto la Ley Núm. 21-1987 como el Reglamento de Planificación Núm. 20 definen Asociación de Residentes como un "organismo debidamente incorporado en el Departamento de Estado como una organización sin fines de lucro". Es decir, en Puerto Rico las Asociaciones de Residentes tienen que ser Corporaciones Sin Fines de Lucro. Como vimos, la otorgación, radicación e inscripción del Certificado de Incorporación es condición *sine qua non* para que una corporación nazca a la vida jurídica. Por ende, y como intimamos anteriormente, una corporación que no ha radicado su Certificado de Incorporación conforme al proceso establecido en la Ley General de Corporaciones no existe *de jure* ni *de facto*. Así las cosas, la Asociación de Residentes se constituye radicando el Certificado de Incorporación correspondiente en el Departamento de Estado, por lo que no basta con hacerla figurar en una Escritura Pública. Ahora bien, ello no significa que -luego de constituida- no pueda gravarse uno o varios lotes mediante la inscripción en el Registro de Propiedad de una Escritura Pública que recoja los pormenores de las facultades y obligaciones de la Asociación de Residentes e incluya las Servidumbres en Equidad que dicha entidad debe implementar. No obstante, los documentos constitutivos principales de la Asociación de Residentes, como organización sin fines de lucro, son el Certificado de Incorporación y los Estatutos Corporativos.

lugar por la ley especial que regula la materia, la Ley General de Corporaciones.

A la fecha en la que se otorgó la Escritura Núm. 60 y se incorporó la Asociación estaba en vigor la Ley Núm. 3-1956. Esta Ley requería toda Corporación sin Fines de Lucro consignara en su Certificado de Incorporación las condiciones que debían reunir las personas que desearan formar parte de la entidad a menos que se estipulara que las condiciones serían establecidas en los Estatutos Corporativos. Como vimos, la Ley General de Corporaciones del 1995 y la del 2009 nada cambiaron en cuanto a este particular. Consecuentemente, y a pesar de lo dispuesto en la Escritura Núm. 60, el Certificado de Incorporación y los Estatutos Corporativos de la Asociación son determinantes al evaluar cuáles son los requisitos para ser miembro de dicha entidad. Ahora bien, ¿qué dispone el Certificado de Incorporación y los Estatutos Corporativos de la Asociación?

El Certificado de Incorporación de la Asociación radicado el 1 de septiembre de 1976 dispone en su cuarto inciso lo siguiente

> CUARTO: Esta corporación no tendrá facultad para emitir acciones del capital. Las condiciones requeridas de los socios son: **(REF: DORADO DEL MAR HOMEOWNERS ASSOCIATION BY-LAWS).**

Es decir, y conforme lo permitía el Art. 102(a)(4) de la Ley Núm. 3-1956, en el Certificado de Incorporación de la Asociación se estipuló que las condiciones requeridas para ser miembro o socio de la Asociación serían establecidas en los Estatutos. Ahora bien, la Asociación enmendó su

Certificado de Incorporación el 14 de mayo de 2007 para, *inter alia*, establecer allí quién podía ser miembro de la entidad. Respecto a este particular, dispuso específicamente que

...

> Todos los residentes de la urbanización Dorado del Mar, incluyendo [sic.] las propiedades segregadas de la finca 1573, inscrita al folio 215, del tomo 41 de Dorado, serán miembros de la Corporación y vendrán obligados al pago de las cuotas para el control de acceso, mantenimiento y seguridad….[20]

De los autos surge que esta enmienda fue debidamente radicada y registrada en el Departamento de Estado. Así las cosas, resolvemos que pueden ser miembros de la Asociación todos los propietarios de Dorado del Mar, independientemente de si sus lotes radican o fueron segregados de las fincas 1573 o 1951 del Municipio de Dorado.

ii.

El Municipio de Dorado formalizó y convalidó el sistema de control de acceso de Dorado del Mar. La Asociación solicitó a la Asamblea Municipal de Dorado que legalizara el control de acceso de Dorado del Mar. De los autos surge que el Municipio de Dorado evaluó la solicitud de la Asociación y, luego de celebrar reuniones y vistas públicas, formalizó y ratificó el sistema de control de acceso de Dorado del Mar mediante la Ordenanza Núm. 18-2012. Cabe destacar que de los autos no surge que los recurridos hayan cuestionado la validez o suficiencia del proceso de formalización. En la

---

[20] Petición de *Certiorari*, págs. 136-137.

Ordenanza Núm. 12-2012, el Municipio afirmó que corroboró que: (1) la Asociación estaba debidamente organizada en el Departamento de Estado como una organización sin fines de lucro; (2) dentro de Dorado del Mar no existía ningún edificio propiedad del Gobierno de Puerto Rico o de los municipios para uso y disfrute del público, salvo escuelas, parques recreativos o centros comunales; y, (3) más de tres cuartas partes [3/4] de los propietarios de Dorado del Mar autorizaron la ratificación del sistema de control de acceso. Así las cosas, y por entender que la Asociación cumplió con los requisitos enumerados en la Sección 64a de la Ley Núm. 21-1987, *supra*, el Municipio de Dorado ratificó el sistema de control de acceso de Dorado del Mar. Consecuentemente, quiénes autorizaron el proceso de formalización y convalidación antes descrito se obligaron a satisfacer las cuotas para su operación y mantenimiento. Véase: 23 LPRA sec. 64d-3(a)(2), (5) (Supl. 2018).

IV.

Por todo lo anteriormente expuesto, se revoca la Sentencia recurrida. Se devuelve el caso de autos al Tribunal de Primera Instancia para la continuación de los procedimientos que sean consistentes con estos pronunciamientos.

Mildred G. Pabón Charneco
Jueza Asociada

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | | |
|---|---|---|
| Dorado del Mar Estates Homeowners Association, Inc.<br><br>Peticionaria<br><br>v.<br><br>Carlos Weber y su esposa Abigail Marrero Pérez<br><br>Recurridos | CC-2017-467 | *Certiorari* |

SENTENCIA

En San Juan, Puerto Rico, a 6 de agosto de 2019.

Por todo lo anteriormente expuesto, se revoca la Sentencia recurrida. Se devuelve el caso de autos al Tribunal de Primera Instancia para la continuación de los procedimientos que sean consistentes con estos pronunciamientos.

Lo acordó y manda el Tribunal y certifica el Secretario del Tribunal Supremo. La Jueza Presidenta Oronoz Rodríguez, el Juez Asociado señor Estrella Martínez y el Juez Asociado señor Cólon Pérez concurren con el resultado sin opinión escrita. La Juez Asociada señora Rodríguez Rodríguez no intervino.


José Ignacio Campos Pérez
Secretario del Tribunal Supremo